**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Lynn Bible, | No. CV-98-1859-PHX-PGR |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| vs. | |
| | **MEMORANDUM OF DECISION AND ORDER** |
| Dora B. Schriro, et al., | |
| Respondents. | |

On October 15, 1998, Richard Lynn Bible ("Petitioner") filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. (Dkt. 1.)[1] An Amended Petition filed on August 2, 1999, presented twenty-two claims for relief, including numerous subclaims. (Dkt. 29.) In an Order dated September 2, 2004, the Court found that the entirety of Claims 12, 18, 19, 21, and 22, along with parts of Claims 3, 8-10, 13-16, and 20, were procedurally barred. (Dkt. 79.) The Court found that Claims 1-11, 13-17, and 20 were properly exhausted, in whole or in part. (*Id.*) On January 20, 2005, Respondents filed an answer addressing the merits of the non-defaulted claims. (Dkt. 90.) Petitioner filed a reply on August 10, 2005 (Dkt. 98.)

---

[1] "Dkt." refers to the documents in this Court's file. "RT" refers to the state court reporter's transcript; "ROA" refers to the three-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-90-0167-AP). "ME" refers to the minute entries of the state court. The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court. (*See* Dkt. 37.)

This Order addresses the merits of Petitioner's properly exhausted claims. For the reasons set forth herein, the Court concludes that Petitioner is not entitled to habeas relief.

## BACKGROUND

A jury convicted Petitioner of the kidnapping, molestation, and murder of a nine-year-old girl named Jennifer Wilson. The court sentenced him to death. The following facts are supported by this Court's review of the entire record and, unless otherwise indicated, are taken from the decision of the Arizona Supreme Court in *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993).[2]

In late May 1987, Petitioner was released from prison after serving a sentence imposed in 1981 for the kidnapping and rape of his seventeen-year-old cousin.

In April 1988, the Coconino County Sheriff seized a dark green and white GMC "Jimmy" vehicle in Sedona, Arizona. The vehicle had a damaged left rear quarter panel. Officers also noticed that rubber bands were scattered within the vehicle.[3] The vehicle was stored in a fenced impound lot near Flagstaff, close to an area known as Sheep Hill. On June 5, 1988, Petitioner stole the GMC from the impound lot. An officer saw the vehicle parked in Flagstaff later that day.

The next day, June 6, 1988, shortly after 10:30 a.m., Jennifer Wilson began bicycling from her family's lodgings in Flagstaff to a ranch a mile away.[4] Her family passed her while

---

[2]    The Court has "resolve[d] all conflicting factual inferences in favor of the prosecution." *Juan H. v. Allen*, 408 F.3d 1262, 1266 n.1 (9th Cir. 2005); *see Jackson v. Virginia*, 443 U.S. 307, 326 (1979) ("a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

[3]    The owner had used the vehicle to deliver newspapers; the papers were wrapped in rubber bands.

[4]    The Wilson family had relocated from Yuma to Flagstaff, where Mr. Wilson's construction company had business that summer. (RT 3/8/90 at 4.) Early on the morning of June 6, Mr. Wilson left for the Twin Cities on a business trip (*id.* at 10-11); after being informed of Jennifer's disappearance he returned to Flagstaff that night (*id.* at 83).

driving to the ranch in their tan-colored pickup truck.  When the child did not arrive at the ranch, the family set out to search for her.  They found her bicycle by the side of the road. Jennifer's mother, Nancy Wilson, called the police at 11:21 a.m.

The Flagstaff police arrived within minutes.  They called in a helicopter, set up roadblocks, and alerted the FBI.  Mrs. Wilson told the police that she saw two vehicles on her way to the ranch. One was a royal blue Blazer-type vehicle.  While at the ranch, she saw this same vehicle going the opposite direction at a high rate of speed.  She described the driver as a Caucasian male in his mid-to-late twenties, with dark hair and a dark complexion, possibly wearing a white t-shirt.  According to Mrs. Wilson, the man had looked at her intently.

That same day, Petitioner arrived at his brother Wesley's home near Sheep Hill shortly before 1:00 p.m., driving a dark green or dark silver, white-top Blazer-type vehicle with a dented left bumper. Petitioner was wearing jeans, a plaid shirt, a camouflage baseball-type cap, and boots.  He told Wesley that the Blazer belonged to a friend.  After Petitioner left, Wesley called the police and described the vehicle.  A neighbor boy also witnessed Petitioner's presence at Wesley's house.  (RT 3/9/90 at 135.)  The boy phoned his mother, who then called Petitioner's mother; Petitioner's mother called the sheriff.  (*Id.* At 159-61.)

Shortly thereafter, a detective realized that Mrs. Wilson's description of the Blazer-type vehicle and its driver approximated Petitioner and the GMC Jimmy.  At about 5:00 p.m., the GMC was discovered missing from the impound lot.  At 6:20 p.m., police officers saw Petitioner driving the GMC, which had been painted a different color.  The officers attempted to stop Petitioner, and a high-speed chase began.  Petitioner finally drove the vehicle off the road and into a cattle guard; he exited the vehicle while it was still moving and ran into the forest.

Using a tracking dog, officers found Petitioner hiding under a ledge, where he had camouflaged himself with branches and debris.  Petitioner was wearing a "levi-type" jacket,

jeans, a plaid shirt, and boots; he was not wearing underwear. He was carrying wool gloves, despite the summer heat. Nearby, police located a baseball-type cap. Police also found a large folding knife in Petitioner's hiding place and another knife in one of his pockets.

Petitioner confessed that he had stolen the GMC the previous day and painted the vehicle two hours before his arrest, but denied being in the area of the abduction. He explained that he had planned to drive the GMC to Phoenix, but a helicopter had him "pinned down."

In the GMC, police found a green blanket and numerous rubber bands but no rubber band bags. The steering column had been cut open and a piece of metal had fallen to the floorboard. The vehicle contained a case of twenty 50-milliliter bottles of "Suntory" vodka; two bottles were missing. In the vehicle's console was a wrapped cigar broken in two places; a "Dutchmaster" cigar wrapper and band were in the ashtray. The vehicle also contained Carnation "Rich" hot chocolate packets. Investigators found blood smeared inside and under the GMC; testing failed to reveal whether the blood was human.

Despite an intensive search involving multiple law-enforcement agencies, Jennifer Wilson's body was not found until June 25, nearly three weeks after her disappearance, when a couple walking in the Sheep Hill area discovered items of children's clothing and notified the police. Officers located Jennifer's naked body at the top of the hill. It was hidden under a tree, mostly covered branches and debris. Jennifer's hands were tied behind her back with a shoelace.

Police secured the area that night and returned the next morning to process the scene.[5] They found one of the child's sneakers, without a shoelace, near the body. Her panties were

---

[5]     Despite vigorous efforts to dissuade him, Jennifer's father accompanied officers to the top of Sheep Hill and spent the night there. (*See* RT 3/13/90 at 126-29; RT 3/8/90 at 87-102.) The next morning he identified his daughter's body and carried it down the hill in a body bag. (*See id.* at 105-09; RT 3/14/90 at 22-23.) While at the scene his actions were closely monitored; he obeyed the officers' directives not to disturb the evidence. (*See* RT 3/13/90 at 129; RT 3/14/90 at 64, 150.)

in a tree.  An unwrapped, unsmoked cigar with two breaks in the middle was on the ground near the body.  This cigar and the cigar found in the GMC appeared very similar; they had consistent breaks and identical seals.  Microscopic analysis showed that the cigars had similar thresh cuts, tobacco mixtures, sieve test results, and pH values.  The cigars were from the same lot; the tobacco was indistinguishable from residue found in Petitioner's shirt pockets.

An empty ten-pack box of Carnation "Rich" hot chocolate – matching the packets in the GMC – was found near the body.  Also nearby were two empty 50-milliliter "Suntory" vodka bottles, identical to the full bottles found in the GMC.  No fingerprints were found on the bottles.

Rubber bands were scattered throughout the scene: on a path near the body; over, on, and under the body; in the tree where the panties were hanging; near other items of Jennifer's clothing; in the brush covering the body; in a tree above the body; and under a tree where one of Jennifer's shoes was found.  Visual observation and testing revealed that the rubber bands in the GMC were identical to those found near the body.  A rubber band bag containing a few rubber bands was found five feet from the body.

There was a patch of blood-matted grass near Jennifer's body.  Testing revealed that this blood was human and was phosphoglucomutase ("PGM") subtype 2+, the same subtype as the victim's blood.  Luminol spraying revealed a faint blood trail leading from the blood-matted grass to the body.  Blood was also present on the top of the branches covering the body.

Near the body, police found a piece of metal that fit the GMC's steering column.  In Flagstaff, at the location where the GMC was seen parked the day before the victim disappeared, police found another piece of metal from the vehicle's steering column.  The three metal pieces – found inside the GMC, near the body, and where the GMC had been parked – fit together like jigsaw puzzle pieces.  An investigator concluded that the three metal pieces were part of the GMC's steering column.

The condition of the body was consistent with having been on Sheep Hill for approximately three weeks.  Multiple skull fractures and a broken jawbone indicated that blows to the head, probably with a heavy blunt object, were the cause of death.  (RT 2/29/90 at 152.)  The blood-matted grass near the body was consistent with the blows being inflicted there.  Although the body was naked with the hands tied, suggesting sexual molestation, no sperm or semen was found, possibly because the victim's genital region, like her head, was severely decomposed.  (*Id.* at 138.)

Near the body were several clusters of golden brown hair approximately six to ten inches long.  The hair found at the scene was microscopically similar to Jennifer's hair and could have come from her.  In one of the locks of hair, an examiner found a pubic-type hair, which was similar to Petitioner's pubic hair samples.  Hair found on Petitioner's jacket, shirt, and in his wallet were similar to Jennifer's hair and could have come from her.  Investigators also found hair similar to Petitioner's on a sheet used to wrap the body and on Jennifer's t-shirt.  Hair on a blanket in the GMC was similar to the Jennifer's; a total of fifty-seven hairs in the GMC were consistent with her hair.

Some of the hair found near the body, as well as the hair on Petitioner's shirt and in his wallet, and hairs found inside the vehicle, was cut on one side and torn on the other.  The investigator had never before seen such a cut/tear pattern but was able to duplicate the pattern by using the knives Petitioner possessed when arrested.  Twenty-one of the twenty-two hairs on Petitioner's jacket had similar cut/tear patterns.

Fibers found at Sheep Hill were identical to the GMC's seat covers, and similar to fibers from Petitioner's jacket lining and the green blanket in the GMC.  Fibers in the lock of hair containing the pubic-type hair were similar to fibers from Petitioner's jacket.  Fibers similar to those from the green blanket in the GMC were located in the branches covering the body.  A green fiber on the sheet used to wrap the body was microscopically similar to fibers from the green blanket.  A blue or purple fiber on the shoelace tying the victim's hands was similar to the lining in Petitioner's jacket.

Investigators found blood on Petitioner's shirt, pants, and boots.  The spatter pattern on the shirt was consistent with beating force.  Testing could not determine whether the blood on his boots was human but revealed that the blood on Petitioner's shirt was human and the same subtype as Jennifer's blood, a subtype shared by less than three percent of the population.[6]

On August 4, 1988, Petitioner was indicted on counts of first-degree murder, kidnapping, and molestation of a child under the age of fifteen.  In April 1990, after a six-week trial, a jury convicted him of all charges.

Following a sentencing hearing in June 1990, the trial court[7] found as aggravating factors that: (1) Petitioner had been convicted previously of a felony involving the use or threat of violence, pursuant to A.R.S. § 13-703(F)(2), based on the 1981 conviction for kidnapping and sexual assault; (2) Petitioner committed the murder in an especially cruel manner, under § 13-703(F)(6); and (3) Petitioner was an adult and the victim was less than fifteen years of age, under § 13-703(F)(9).  The court found no mitigation.  Concluding that any one of the aggravating factors alone was sufficient to warrant a death sentence, the trial court sentenced Petitioner to death for the murder.

On appeal, the Arizona Supreme Court held that the judge erred in finding that Petitioner's 1981 conviction qualified as a crime involving the use or threat of violence, but nonetheless affirmed the death sentence in light of the *de minimis* mitigation evidence.  *Bible*, 175 Ariz. at 604, 609, 858 P.2d at 1207, 1212.  Petitioner unsuccessfully petitioned for a writ

---

[6]     The trial court also admitted evidence indicating that DNA from the blood on Petitioner's shirt matched the victim's DNA.  (The State's expert testified that the possibility of a random match was between one in sixty million and one in fourteen billion.)  However, the Arizona Supreme Court, after an extensive analysis, found that evidence was erroneously admitted because the method used by the laboratory for deriving random match probability figures for the DNA samples was not generally accepted in the relevant scientific community.  *Bible*, 175 Ariz. at 586, 858 P.2d at 1189.  The court concluded, however, that the error was harmless in light of other evidence.  *Id.*

[7]     Coconino County Superior Court Judge Richard K. Mangum presided over Petitioner's trial and sentencing.

1    of certiorari.  *Bible v. Arizona*, 511 U.S. 1046 (1994).

2         On November 29, 1996, Petitioner filed a Petition for Post-conviction Relief ("PCR")

3    pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  The PCR court declined

4    to hold an evidentiary hearing and, in November 1997, denied relief.[8]  (ME 11/24/97.)  On

5    December 27, 1997, Petitioner sought review in the Arizona Supreme Court, which

6    summarily denied the petition in September 1998.   Petitioner thereafter commenced these

7    proceedings.

8                        **AEDPA STANDARD FOR RELIEF**

9         Petitioner's habeas claims are governed by the applicable provisions of the

10   Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S.

11   320, 336 (1997).  The AEDPA established a "substantially higher threshold for habeas relief"

12   with the "acknowledged purpose of 'reducing delays in the execution of state and federal

13   criminal sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting

14   *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential

15   standard for evaluating state-court rulings' . . . demands that state-court decisions be given

16   the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)

17   (quoting *Lindh,* 521 U.S. at 333 n.7).

18        Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

19   "adjudicated on the merits" by the state court unless that adjudication:

20        (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the Supreme
21        Court of the United States; or

22        (2) resulted in a decision that was based on an unreasonable determination of
         the facts in light of the evidence presented in the State court proceeding.
23

24   28 U.S.C. § 2254(d).

25        The phrase "adjudicated on the merits" refers to a decision resolving a party's claim

26   _____

27        [8]    Coconino County Superior Court Judge Charles D. Adams presided over the
     post-conviction proceedings.

28                               - 8 -

1  which is based on the substance of the claim rather than on a procedural or other non-

2  substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant

3  state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*,

4  423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

5  (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

6  　　"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

7  of law that was clearly established at the time his state-court conviction became final."

8  *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection

9  (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

10  the sufficiency of the claims on habeas review. "Clearly established" federal law consists

11  of the holdings of the Supreme Court at the time the petitioner's state court conviction

12  became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006);

13  *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if

14  the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

15  advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529

16  U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir.

17  2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent

18  may be "persuasive" in determining what law is clearly established and whether a state court

19  applied that law unreasonably. *Clark*, 331 F.3d at 1069.

20  　　The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

21  The Court has explained that a state court decision is "contrary to" the Supreme Court's

22  clearly established precedents if the decision applies a rule that contradicts the governing law

23  set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

24  Supreme Court on a matter of law, or if it confronts a set of facts that is materially

25  indistinguishable from a decision of the Supreme Court but reaches a different result.

26  *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In

27

28  　　　　　　　　　　　　　　　　　　　- 9 -

characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that

1    subsection pertains only to state-court determinations of factual issues, rather than
2    decisions.").

3           As the Ninth Circuit has noted, application of the foregoing standards presents
4    difficulties when the state court decided the merits of a claim without providing its rationale.
5    *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,
6    1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those
7    circumstances, a federal court independently reviews the record to assess whether the state
8    court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d
9    at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal
10   court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167
11   (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state
12   court did not decide the merits of a properly raised claim will the claim be reviewed de novo,
13   because in that circumstance "there is no state court decision on [the] issue to which to
14   accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,
15   1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

16
17          In addition to the standards discussed above, the Court's review of Petitioner's claims
18   is guided by two fundamental, related, principles.  The first of these concerns the limited role
19   of habeas review and recognizes that "[d]irect review is the principal avenue for challenging
20   a conviction."  *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).  Therefore, as the Supreme
21   Court has explained:

22              When the process of direct review . . .  comes to an end, a presumption of
23          finality and legality attaches to the conviction and sentence.  The role of
            federal habeas proceedings, while important in assuring that constitutional
24          rights are observed, is secondary and limited.  Federal courts are not forums
            in which to relitigate state trials.

25   *Barefoot v. Estelle,* 463 U.S. 880, 887 (1983).

26          The second principle is that, in the context of habeas review, an error at trial is
27
28
                                          - 11 -

1   harmless unless it had a "'substantial and injurious effect or influence in determining the

2   jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. at 637 (quoting *Kotteakos v. United States,*

3   328 U.S. 750, 776 (1946)).  Therefore, trial errors are often found harmless where the record

4   is replete with overwhelming evidence of the petitioner's guilt.  *See Neder v. United States,*

5   527 U.S. 1, 18-19 (1999).  In the instant case, as the Arizona Supreme Court observed, the

6   evidence of Petitioner's guilt, even with the exclusion of the DNA evidence linking him to

7   the crimes, is "far beyond overwhelming"; it is "not only inconsistent with any reasonable

8   hypothesis of innocence, it refutes any hypothesis other than [Petitioner's] guilt." *Bible*, 175

9   Ariz. at 589, 858 P.2d at 1192.[9]

10      In addition to these legal principles, a further reality informs much of the following

11  analysis.  Petitioner's trial was the first Arizona case in which the State sought to introduce

12  DNA evidence.  Forensic evidence and the novel scientific analysis to which it was subjected

13  were the focus of the trial.  The efforts of all the participants, including defense counsel, were

14  necessarily directed toward this pioneering aspect of the case.

15      The Court now turns to the merits of Petitioner's habeas claims.

16  **Pretrial Publicity and Voir Dire**

17      Petitioner alleges that his right to a fair trial was violated by the trial court's failure

18  to grant his motion for a change of venue based on excessive and prejudicial pretrial publicity

19

20      [9]      The Arizona Supreme Court accurately catalogued and characterized much of

21  this evidence:

22      It is simply inconceivable that anyone other than the person who had the GMC
        perpetrated the crime.  Nothing else explains the rubber bands, rubber band

23      bag, vodka bottles, hot chocolate packets and container, cigars, and metal
        pieces from the steering column.  There is no question that Defendant

24      possessed the vehicle and no evidence that anyone else possessed the GMC
        during the relevant time period.  Even if one were inclined to speculate about

25      who controlled the vehicle, there is the evidence – fibers, hair, blood, and
        knives – tying Defendant to the vehicle, to the victim, to the crime scene, and

26      to the crime.  Defendant advances no theory of how all this could be explained
        unless Defendant, and only Defendant, committed the crime.

27  *Bible*, 175 Ariz. at 589, 858 P.2d at 1192.

28

1    (Dkt. 29 at 10-14), by the hostile and inflamed atmosphere at trial (*id.* at 14-20), and by the

2    inadequate voir dire process engaged in by the court (*id.* at 22-26).

3        Background:

4        On December 9, 1988, Petitioner filed his first motion for a change of trial site; he

5    filed a supplement to the motion on February 10, 1989. (ROA 174; ROA 246.) The motion

6    summarized dozens of news items dating from June 1988 to February 1989. These items

7    reported, inter alia, that Petitioner had committed other crimes, had failed a polygraph test,

8    and had attempted to escape from jail; the articles also referred to other evidence

9    subsequently deemed inadmissible at trial. The trial court held a hearing on Petitioner's

10   motion. Petitioner presented several witnesses, including a television news director (RT

11   2/10/89 at 4) and the Coconino County Sheriff (*id.* at 11). The sheriff acknowledged

12   speaking with reporters about the results of Petitioner's polygraph examination and his

13   criminal record. (*Id.* at 14.) Petitioner presented and the court admitted copies of newspaper

14   articles and other electronic media reports. Petitioner also argued that the State's practice

15   of incorporating prejudicial information in its motions generated adverse publicity.

16       The court denied the change of venue motion, finding that "the media coverage has

17   been appropriate and covered in a professional manner. The coverage has been ordinary for

18   a high profile case." (ME 2/10/89 at 2.) The court concluded that "the Defendant has failed

19   to carry his burden of showing that he would receive an unfair trial in Flagstaff." (*Id.*)

20   Petitioner subsequently filed a motion for reconsideration (ROA 375); the court heard

21   argument the day before trial began. The court again denied the motion but stated that "if

22   it later became obvious that there cannot be a fair jury, the motion would be reconsidered."

23   (ME 3/5/90 at 1.) Petitioner did not renew the motion.

24       With respect to jury selection, the parties agreed that the initial voir dire process

25   should be conducted through the use of a written questionnaire. Defense counsel drafted the

26   questionnaire and submitted it to the prosecutor and the court. Despite the prosecutor's

27

28                                              - 13 -

complaints, the court used Petitioner's questionnaire as submitted. (*See* RT 2/20/90 at 17; RT 3/1/90 at 1-11.)

The thirty-page questionnaire contained fifty-six questions, many with several sub-parts. (ROA 486.) The questions addressed the potential jurors' knowledge of the case and the source of such information.[10] (*Id.*) Additional topics included the news media and perceptions of media accuracy, law enforcement, scientific testing, and the death penalty, as well as the prospective jurors' familiarity with Petitioner and potential witnesses. (*Id.*) The questionnaire also discussed the standard of proof and the jurors' frame of mind if they were to "sit in judgment." (*Id.*) Each potential juror filled out and signed his or her individual questionnaire under oath and in the court's presence.

By February 26, 1990, 187 potential jurors completed written questionnaires. Almost all of the 187 had heard about the case, approximately two-thirds had discussed the case, and approximately one-half had an opinion about Petitioner's guilt. *Bible*, 175 Ariz. at 563, 858 P.2d at 1166. As characterized by the questionnaire, such opinions were either "qualified" or "unqualified."[11] Of the fourteen jurors who heard the case, all had been exposed to some

---

[10]   Questions included the following: "Have you read, heard or seen anything about this case before today?  If yes, what has been the source of your information [listing newspaper, television, radio, friends, and other]?" (ROA 486d.) "Other than this particular case, have you read, seen or heard anything else about Richard Bible, the defendant?  If yes, describe in detail what you have read, seen or heard." (ROA 486e.) "If you have read, seen or heard anything about this case or Richard Lynn Bible, would you be able to set aside those things which you have read, seen or heard and judge this case fairly and impartially on the evidence presented in court and the instructions given to you by the court at the end of this case?" (*Id.*)

[11]   The question concerning potential jurors' opinion of Petitioner's guilt read:

Have you already formed an opinion as to whether Richard Lynn Bible is guilty or not guilty?  If your answer is yes, your opinion may be qualified or unqualified.  It is an unqualified opinion if it is fixed and settled, that is, if you have made up your mind that Richard Lynn Bible is guilty or not guilty and nothing will change it.  It is a qualified opinion if you can set aside that opinion and render a verdict based solely on the evidence presented in court. If your answer above if "yes," that you have already formed an opinion as to the guilt or innocence of Richard Lynn Bible, is it qualified or unqualified?

(ROA 486e.)

publicity about the case, more than half were familiar with the State's investigators, half had discussed the case, and two jurors – one of whom became an alternate – had a "qualified" opinion as to guilt at the time they answered the jury questionnaire. *Id.* However, all of the jurors answered that they could set aside what they had heard and decide the case fairly and impartially. *Id*. at 566, 858 P.2d at 1169.

Defense counsel had "no objection to the Judge deciding who should be removed for cause." (RT 3/1/90 at 9.) After reviewing the completed questionnaires, the trial court, sua sponte, struck a total of 106 of the 187 venire members for cause. (RT 3/5/90 at 2.) On the parties' motions, the court struck several other venire members for cause. (ME 3/5/90, 3/6/90.) Fifteen additional venire members failed to appear or were excused for personal reasons, leaving sixty-one individuals for jury selection. *See Bible*, 175 Ariz. at 566, 858 P.2d at 1169.

Petitioner filed a motion for individual voir dire. (ROA 371.) The court ruled that, absent good cause, it would conduct oral voir dire and that individual voir dire would "be permitted only in extreme circumstances." (ME 3/1/90.) Before oral voir dire, the judge met with counsel to discuss the questions he proposed asking the potential jurors; defense counsel did not object to the court's proposals. (RT 3/6/90 at 5-6.) The court then conducted a brief, general oral voir dire of the panel of sixty-one. (*Id.* at 42-55.) During this portion of voir dire, the court addressed the issue of pretrial publicity:

> Quite a few of you answered [on the questionnaire] that you knew something about this case because of, oh, the newspapers or information that you got from other sources, because it has been in the news, and we are not surprised that many of you know about it.
>
> We went on further to ask whether you had formed some kind of opinion about guilt or innocence based on what you had heard coming in here, and whether you could keep an open mind.
>
> I want to tell you what a bit more about what the law is in this area. It is all right if you know something about the case, even if you may have formed a tentative opinion about it, if you can put that opinion aside.
>
> Now here is what the law says. It is your duty as a juror to determine the facts. Facts means what actually happened. You must determine the facts

- 15 -

only from the evidence produced in court.

So this is what counts, not what you have read outside, not what you may have heard commented on or anything else.

You should know nothing has been proven, and until it's proven right here in court, until the jury in this case makes decisions on it, so let's be sure we all understand each other on this.  Is there anyone here whose mind is so firmly made up ahead of time that you cannot keep an open mind and base your verdict solely on evidence presented in court?

(No response indicated.)

Okay.  I see no hands.

(*Id.* at 46-47.)

A panel of thirty-four was then drawn.  (*Id.* at 55-56.)  This panel answered additional voir dire questions.  (*Id.* at 57-67.)  Both parties passed the panel and exercised their peremptory strikes.  (*Id.* at 66-68.)

The trial court first addressed the issue of pretrial publicity early in the case, when it heard Petitioner's motion to close the proceedings.  The court denied the motion, finding that "the media coverage in this case . . . has been competent, professional, and non-hysterical." (ME 10/27/88.)  The judge allowed one camera in the courtroom, but prohibited photographs of the jurors.  (*Id.*; *see* ME 3/5/90; RT 3/6/90 at 81.)

Not surprisingly, the trial was conducted in an atmosphere of high emotion.  At one point while listening to trial testimony, Richard Wilson, the victim's father, hurriedly left his seat and exited the courtroom, shouting an obscenity when he entered the hallway.  (RT 3/28/90 at 205.)  The court denied Petitioner's motion for a mistrial, but banned Mr. Wilson from the remainder of the proceedings.  (ME 3/28/90 at 3.)

**Claim 1:**      **Petitioner's Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair and impartial jury were violated by the trial court's refusal to change venue.**

**Claim 2:**      **The atmosphere at trial, coupled with the pretrial publicity, deprived Petitioner of his right to a fair trial in violation of the Fifth and Fourteenth Amendments.**

Clearly established federal law:

1    A criminal defendant in entitled to a fair trial by "a panel of impartial, 'indifferent'

2  jurors." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961).  Therefore, "if pretrial publicity makes it

3  impossible to seat an impartial jury, then the trial judge must grant the defendant's motion

4  for a change of venue."  *Casey v. Moore*, 386 F.3d at 906 (citing *Harris v. Pulley,* 885 F.2d

5  1354, 1361 (9th Cir. 1988)).

6    The Supreme Court has discussed two types of prejudice resulting from pretrial

7  publicity: presumed prejudice, where the setting of the trial is inherently prejudicial, and

8  actual prejudice, where *voir dire* is inadequate to offset extensive and biased media coverage.

9  *See Murphy v. Florida*, 421 U.S. 794, 798 (1975).

10    A court presumes prejudice only in the face of a "trial atmosphere utterly corrupted

11  by press coverage," *Dobbert v. Florida,* 432 U.S. 282, 303 (1977), or a "wave of public

12  passion that would make a fair trial unlikely by the jury," *Patton v. Yount,* 467 U.S. 1025,

13  1040 (1984).  The presumption of prejudice is "rarely applicable and is reserved for an

14  'extreme situation.'" *Harris v. Pulley,* 885 F.2d at 1361 (internal citations omitted).  The

15  United States Supreme Court has found presumed prejudice in only three cases: *Rideau v.*

16  *Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532, 536 (1965); and *Sheppard v.*

17  *Maxwell*, 384 U.S. 333 (1966).

18    Where prejudice is not presumed, a defendant bears the burden of proving that pretrial

19  publicity probably deprived him of a fair trial.  It is well established that jurors need not "be

20  totally ignorant of the facts and issues involved." *Irvin*, 366 U.S. at 722.  Rather, "[i]t is

21  sufficient if the juror can lay aside his impression or opinion and render a verdict based on

22  the evidence presented in court." *Id.* at 723; *see Patton*, 467 U.S. at 1035 ("The relevant

23  question is not whether the community remembered the case, but whether the jurors . . . had

24  such fixed opinions that they could not judge impartially the guilt of the defendant.").

25    To assess whether actual prejudice existed, the court looks at voir dire of the

26  individual jurors. The Supreme Court has explained that a factor in gauging the reliability

27  of juror assurances of impartiality is the percentage of venire members who "will admit to

28

a disqualifying prejudice"; the greater the percentage of members admitting to a previously formed opinion, the greater the concern over the reliability of the voir dire responses from the remaining potential jurors. *Murphy,* 421 U.S. at 803; *see Harris v. Pulley*, 885 F.3d at 1364.

Pretrial publicity can also contribute to a violation of a defendant's fair trial rights by denying him a courtroom characterized by "judicial serenity and calm." *Estes v. Texas*, 381 U.S. 532, 536 (1965); *see Sheppard*, 384 U.S. at 355. Thus, a defendant is denied a fair trial when the proceedings are "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy*, 421 U.S. at 799.

State court decision:

The Arizona Supreme Court, engaging in a thorough review and analysis of Petitioner's claims, rejected Petitioner's contention that he was denied a fair trial due to excessive and prejudicial pretrial publicity. *Bible*, 175 Ariz. at 563-69, 858 P.2d at 1166-72. In making its rulings, the court applied controlling Supreme Court precedent, including *Rideau*, *Irvin*, *Sheppard*, *Murphy*, and *Patton*. *Id.*

The court first ruled that Petitioner failed to meet his burden with respect to a showing of presumed prejudice. Comparing the publicity in Petitioner's case to that in cases, including *Rideau* and *Sheppard*, where reviewing courts had found presumed prejudice, the Arizona Supreme Court explained that "[t]hese cases show more in the way of inaccurate as well as extremely prejudicial pretrial publicity than does the totality of the record in this case. These cases also demonstrate the media's successful and sometimes relentless attempt to whip up hysteria and passion in the community – something the present case lacks." *Id.* at 565, 858 P.2d at 1168. The court further observed that the "substance" of the publicity in Petitioner's case was not "comparable" to that found in other presumed-prejudice cases, including *Rideau*, "where a local television station thrice showed the Petitioner's confession." *Id.*

- 18 -

1    The court next determined that Petitioner could not show that he suffered actual
2    prejudice due to pretrial publicity.  *Id.* at 566-67, 858 P.2d at 1169-70.  The court noted that
3    after the trial court excused 111 potential jurors, less than twenty-five percent of the
4    remaining sixty-one venire members had a qualified opinion regarding guilt and only two of
5    those individuals served; furthermore, no member had an unqualified opinion of Petitioner's
6    guilt, and all the jurors who actually served on the case indicated that they could set aside
7    their qualified opinions and decide the case based on evidence produced at trial.  *Id.* at 566,
8    858 P.2d at 1169.  With respect to these figures, the court also explained that Petitioner's
9    case was not one "where the voir dire record itself shows that pervasive pretrial publicity so
10   tainted the venire that jurors' statements under oath regarding their ability to set aside
11   preconceptions and render a verdict on the evidence must be rejected."  *Id.* n.6.  While the
12   court noted that there was not "an extensive oral voir dire record," it nevertheless concluded
13   that "[g]iven the questionnaire answers and the record before us, Petitioner has not shown
14   actual prejudice.  Accordingly, we reject his claim that pretrial publicity caused actual
15   prejudice requiring a change in venue."  *Id.* at 566-67, 858 P.2d at 1169-70.

16       The Arizona Supreme Court next rejected Petitioner's claim that the atmosphere of
17   the courtroom combined with the publicity to deny him a fair trial.  *Id.* at 567-69, 858 P.2d
18   at 1170-72.  In support of this claim, Petitioner offered newspaper articles reporting several
19   incidents – for example, that the victim's family members and other spectators wore small
20   pink bows during trial, that several of the jurors and the judge cried as the parents of the
21   victim testified, and that a sheriff came close to weeping when testifying.  *Id.* at 567, 858
22   P.2d at 1170. The court found that these reports, standing alone, were insufficient to support
23   a finding that the trial atmosphere was so prejudicial as to deprive Petitioner of a fair trial.
24   *Id.* at 568, 858 P.2d at 1171.  The court distinguished the circumstances of Petitioner's trial
25   from those in cases where the atmosphere was so carnival-like or inflammatory that it
26   violated the defendant's right to a fair trial: "Unlike *Estes*, there is no suggestion that the
27   media took over the proceedings.  And distinguishable from *Sheppard*, there is no indication

28

that the court so accommodated the public that the proceedings were constitutionally unfair." *Id.* While noting that some of the incidents described by the newspaper articles were "disturbing," the court declined to presume prejudice because, apart from the articles, Petitioner presented no evidence concerning courtroom events. *Id.*

Analysis:

This Court has independently reviewed the record, examining the media reports for "volume, timing, and content." *Harris v. Pulley,* 885 F.2d at 1360.  Trial began on March 6, 1990, some twenty-one months after the disappearance of Jennifer Wilson and Petitioner's arrest.  In the year prior to the trial, thirty-nine items appeared in the print media, thirty in the local paper, the Arizona Daily Sun, and nine in the Arizona Republic. (ROA 174; *see* Dkt. 98, Ex. 2.)  All but two of the items were factual articles, reporting on developments in the case; there was also one editorial and one letter to the editor. (*Id.*)  From June 8 to December 1, 1988, sixty-six print items appeared. (*Id.*)  The record also contains what appears to be transcripts or summaries of some eighteen radio or television broadcasts, all of which are factual in nature. (*Id.*)

As the Arizona Supreme Court accurately observed, "Some reports are duplicates, containing similar material published in different newspapers; some do not mention Defendant; and several state that Defendant was not a suspect or not a strong suspect.  For the most part, the reports are factually based, and nearly all of the factual information reported in the articles was admitted at trial." *Bible*, 175 Ariz. at 564, 858 P.2d at 1167.  In addition, some articles identified a different potential suspect, while others reported defense theories of the case.  However, as the court also noted, some articles were clearly prejudicial in nature, though even these items contained balancing information:

> For example, a June 10, 1988, article has the Sheriff stating that Petitioner "'flunked' a lie detector test."  Petitioner is described as a convicted "child molester" who committed "child rape"– incorrect descriptions of his 1981 sexual assault conviction.  A June 28, 1988, article reported a Phoenix-area legislator suggesting the death penalty for child molesters "even if it means the execution 'of a few innocent people.'"  The article, however, added that the suggestion prompted protests, that the proposal was unconstitutional, and

- 20 -

1
2
3

> contained another legislator's response criticizing the suggestion as "'an affront and outrageous'" and not reflecting appropriate legislative "'wisdom and leadership.'"  A January 28, 1990, article has an inmate stating that Petitioner admitted involvement in the victim's abduction.  The article adds, however, that the inmate recanted and repeatedly changed his story.

4  *Id.* at 564, 858 P.2d at 1167.

5      The Arizona Supreme Court's characterization of the records thus comports with this

6  Court's review.  Based upon that review, the Court also concludes that Petitioner has not met

7  his burden of showing either form of prejudice.

8                                        *Presumed prejudice*

9      While Petitioner's case generated substantial media interest, the nature of the coverage

10  is distinguishable from the publicity present in those cases where prejudice has been

11  presumed.  Most significantly, the media coverage of Petitioner's case was neither as

12  pervasive nor as inflammatory as that in cases where the United States Supreme Court found

13  presumptive prejudice, including *Rideau* and *Sheppard*, cases where the "Court overturned

14  a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by

15  press coverage."  *Murphy*, 421 U.S. at 798.

16      In *Rideau*, the defendant's detailed twenty-minute confession was broadcast on

17  television three times; nearly 100,000 people saw or heard the broadcast, in a community of

18  150,000.  373 U.S. at 724.  "What the people of Calcasieu Parish saw on their television sets

19  was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the

20  commission of the robbery, kidnapping, and murder, in response to leading questions by the

21  sheriff."  *Id.* at 725.  The Court explained that the televised confession " *was* Rideau's trial,"

22  and "[a]ny subsequent court proceedings in a community so pervasively exposed to such a

23  spectacle could be but a hollow formality."  *Id.* at 726.

24      In *Sheppard*, "massive, pervasive and prejudicial publicity" prevented the defendant

25  from receiving a fair trial. 384 U.S. at 335.  Much of the publicity was not fact-based or

26  objective but sensational and openly hostile.  For example, articles "stressed [Sheppard's]

27  extra marital love affairs as a motive for the crimes."  *Id.* at 340.  Editorials characterized him

28

as a liar and demanded his arrest. *Id.* at 341.  Other articles described evidence that was never produced at trial. *Id.* at 340.[12]  The Supreme Court described the atmosphere in which Sheppard's trial occurred:

> For months the virulent publicity about Sheppard and the murder had made the case notorious.  Charges and countercharges were aired in the news media besides those for which Sheppard was called to trial.  In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl.  The inquest was televised live from a high school gymnasium seating hundreds of people.

*Id.* at 354.  Despite the extent and tone of this pretrial publicity, the trial court denied Sheppard's motion for a change of venue or a continuance. *Id.* at n.9.

The publicity engendered by Petitioner's case presents a stark contrast with the media excesses which presumptively deprived the defendants of a fair trial in *Rideau* and *Sheppard*. There was no televised confession.  The reports were almost exclusively fact-based and objective. *See Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir.1998), *as amended*, 152 F.3d 1223 (9th Cir.1998); *Gallego v. McDaniel*, 124 F.3d 1065, 1071 (9th Cir. 1997).  With

---

[12]     The Supreme Court catalogued a representative sample of this publicity:

Typical of the coverage during this period is a front-page interview entitled: "DR. SAM: 'I Wish There Was Something I Could Get Off My Chest – but There Isn't.'"  Unfavorable publicity included items such as a cartoon of the body of a sphinx with Sheppard's head and the legend below: "'I Will Do Everything In My Power to Help Solve This Terrible Murder.'– Dr. Sam Sheppard."  Headlines announced, inter alia, that: "Doctor Evidence is Ready for Jury," "Corrigan Tactics Stall Quizzing." "Sheppard 'Gay Set' Is Revealed By Houk," "Blood Is Found In Garage," "New Murder Evidence Is Found, Police Claim," "Dr. Sam Faces Quiz At Jail On Marilyn's Fear Of Him."  On August 18, an article appeared under the headline "Dr. Sam Writes His Own Story."  And reproduced across the entire front page was a portion of the typed statement signed by Sheppard: "I am not guilty of the murder of my wife, Marilyn. How could I, who have been trained to help people and devoted my life to saving life, commit such a terrible and revolting crime?"  We do not detail the coverage further.  There are five volumes filled with similar clippings from each of the three Cleveland newspapers covering the period from the murder until Sheppard's conviction in December 1954.  The record includes no excerpts from newscasts on radio and television but since space was reserved in the courtroom for these media we assume that their coverage was equally large.

*Sheppard*, 384 U.S. at 341-42.

- 22 -

very few exceptions, the items were not sensational or inflammatory, *see Casey v. Moore*, 386 F.3d at 908-09; *Leavitt v. Arave*, 383 F.3d 809, 826 (9th Cir. 2004), and clearly lacked the virulence or hostility of the many of the stories reported in *Sheppard*.[13]   As an indication of the objectivity displayed by the press, several articles presented defense theories of the case and described alternative suspects (*see, e.g.*, ROA 174y, 174bb, 174ggg, 174dddd, 174iiii); an early article indicated that Petitioner was no longer "as strong an investigative lead" as he had been (ROA 174cc).   When the inflammatory opinions of a state legislator were printed, the Daily Sun responded with an editorial counseling restraint; the paper explained that "[o]ur constitutional system says we should first be sure we don't jump to conclusions about who is guilty or innocent.  To do otherwise is to misdirect our anger and grief."  (ROA 174hh.)

Based upon the quantity and quality of the media coverage, the Court concludes that Petitioner's trial was not one of those rare cases where pretrial publicity transformed the proceedings into a "hollow formality." *Rideau*, 373 U.S. at 726.

*Actual prejudice*

As noted previously, approximately half of the original 168 potential jurors had an opinion concerning Petitioner's guilt; according to Petitioner, forty-two members, or one-fourth of the total, had an unqualified opinion.  (Dkt. 29 at 13.)  Of the pool of sixty-one potential jurors remaining after the trial court's excusals for cause, none had an "unqualified" opinion as to Petitioner's guilt.  All of the jurors who determined Petitioner's guilt had gained some familiarity with the case through exposure to the media.  Two of the jurors had

---

[13]   In the four months preceding Petitioner's trial, nine articles appeared in the Daily Sun: "Bible attorneys want DNA evidence banned" (12/13/89); "Hearing begins to streamline Bible case" (1/25/90); "Judge to testify in Bible hearing" (1/26/90); "Bible defense wins battle in evidence ruling" (1/28/90); "Bible defense submits list of possible trial witnesses" (2/11/90); "Bible seeks another delay in murder trial" (2/20/90); "Judge to rule on Bible delay" (2/21/90); "Judge denies Bible motion for new lawyer" (2/22/90); "Bible jury will be chosen from list of 80" (3/5/90). (*See* Dkt. 98, Ex. 2.) These headlines are representative of the fact-based quality of the bulk of the pretrial coverage, particularly as the trial date approached and the coverage focused on the legal proceedings rather than the crime and investigation.

a "qualified" opinion concerning his guilt; the remaining ten had no opinion. All of the jurors answered under oath that they could set aside what they had heard and judge the case fairly and impartially.

Based upon these figures, and the answers provided by the jurors seated to hear the case, Petitioner cannot show actual prejudice; nor do the statistics from Petitioner's case cause this Court to doubt the forthrightness of the juror's answers. Instead, Petitioner's case more closely resembles the situations in *Murphy* and *Yount*, where the Supreme Court held that the right to an impartial jury was not denied.

In *Murphy*, the Supreme Court found that an impartial jury was impaneled where twenty of seventy-eight panel members were excused because they had formed an opinion about the defendant's guilt. 421 U.S. at 803. As in Petitioner's case, the voir dire in *Murphy* "indicate[d] no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." 421 U.S. at 800. In *Yount*, where the defendant was tried twice, publicity had revealed his prior conviction for murder, his confession, and his prior plea of temporary insanity, none of which were admitted as evidence at his second trial. 467 U.S. at 1027. All but two of 163 venire members had heard of the case; 126 of 163 acknowledged that they had an opinion of the defendant's guilt; and eight of the fourteen jurors and alternates actually selected admitted that at some point they had formed an opinion of the defendant's guilt. *Id.* at 1029-30. In addition, some of the seated jurors had provided ambiguous or contradictory voir dire responses regarding their opinion of the case. *Id.* at 1030. Nevertheless, on habeas review the Supreme Court deferred to the trial court's holding that the jurors were impartial because they did not hold a fixed opinion when they were seated as jurors. *Id.* at 1040.

Circuit courts have reached the same conclusion when confronted with similar statistics. *See, e.g.*, *Ritchie v. Rogers*, 313 F.3d 948, 957, 959 (6th Cir. 2002) (four of twelve jurors seated had opinions that were "not firmly held" as to the defendant's guilt); *Hale v. Gibson*, 227 F.3d 1298, 1331-33 (10th Cir. 2000) (thirty-four of thirty-seven jurors

questioned had prior knowledge of the case, twelve had opinions regarding defendant's guilt, and six of those twelve were seated on the jury); *see also United States v. Blom*, 242 F.3d 799, 804-06 (8th Cir. 2001) (on direct review, no actual prejudice where thirty-seven of seventy-five prospective jurors were struck for cause and all jurors selected had at least some knowledge that defendant, charged with being a felon in possession of firearms, was accused of a notorious abduction and murder, but each stated that he or she understood the kidnapping and murder charges were separate and that he or she could set aside pretrial publicity and render an impartial verdict based solely on the evidence presented at trial).

Similarly, the Ninth Circuit has consistently found that a defendant did not suffer actual prejudice due to pretrial publicity where each of the jurors who heard the case swore that he or she could be fair and impartial. *See, e.g.*, *Casey v. Moore*, 386 F.3d at 909 ("Not one juror seated on the eventual panel had said that he or she had definitely formed opinions about the case, and none harbored hostility against Casey that he or she said could not be set aside after hearing evidence."); *Leavitt v. Arave*, 383 F.3d at 826-27 ("[N]o actual prejudice was shown here. On the contrary, each individual who was seated on Leavitt's jury swore that he or she could impartially judge Leavitt's guilt or innocence."); *Gallego v. McDaniel*, 124 F.3d at 1071 ("None of the jurors were shown to have formed the opinion that Gallego was guilty of the crimes with which he had been charged. All of the jurors selected indicated they could follow the law"); *Jeffries v. Blodgett*, 5 F.3d 1180, 1189 (9th Cir. 1993) ("[I]t is immaterial that almost all of the jurors had heard or read about the case prior to trial. All of these jurors swore under oath that they could impartially judge Jeffries' guilt or innocence.").

In *Irvin v. Dowd*, by contrast, over ninety percent of the 430 prospective jurors interviewed held some opinion as to guilt, 268 were dismissed for cause, and eight out of the twelve jurors actually seated stated they believed the defendant was guilty.[14] *Irvin,* 366 U.S.

---

[14]     In *Irvin*, "the rural community in which the trial was held had been subjected to a barrage of inflammatory publicity immediately prior to trial, including information on the defendant's prior convictions, his confession to 24 burglaries and six murders *including*

- 25 -

at 727.  Based on these facts, and the obvious hostility towards the defendant revealed during voir dire, the Supreme Court determined the defendant could not have received a fair trial. *Id.*  In *Rideau*, three members of the jury that convicted him had stated on voir dire that they had seen and heard Rideau's televised interview with the sheriff, and two members of the jury were deputy sheriffs of Calcasieu Parish.  373 U.S. at 724.  Rideau's counsel had requested that these jurors be excused for cause, having exhausted all of their peremptory challenges, but the trial court denied the challenges.  *Id.* at 725.

Finally, as previously noted, the Arizona Supreme Court found that a fair and impartial jury had been empaneled.  This is a factual determination entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  *See Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Wainwright v. Witt*, 469 U.S. 412, 429 (1985); *Yount*, 467 U.S. at 1032, n.7, 1036; *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992); *Lincoln v. Sunn*, 807 F.2d 805, 814 (9th Cir. 1987).  Petitioner has not rebutted this presumption with clear and convincing evidence.

### *Trial atmosphere*

In Claim 2, Petitioner alleges that the courtroom atmosphere was compromised by a number of factors which, combined with the pretrial publicity, rendered his trial unfair. Circumstances cited by Petitioner include an intrusive media presence, the fact that some spectators reportedly wore pink bows in support of the victim, the angry outburst by the victim's father, and the overly emotional testimony of several witnesses.  The Court disagrees that Petitioner's right to a fair trial was violated.

First, the proceedings during Petitioner's trial did not exhibit the level of chaos and the lack of decorum that characterized *Sheppard* and *Estes,* cases where a carnival-like trial atmosphere resulted in a violation of the defendant's due process rights.  In *Estes,* for example, the trial "had been conducted in a circus atmosphere, due in large part to the

the one for which he was tried, and his unaccepted offer to plead guilty to avoid the death sentence."  *Murphy*, 421 U.S. at 798 (emphasis added).

intrusions of the press, which was allowed to overrun it with television equipment." *Murphy*, 421 U.S. at 799.  A two-day pretrial hearing was televised live and then replayed; the broadcasts reached 100,000 viewers.  *Estes*, 381 U.S. at 550.  During the hearing, "the courtroom was a mass of wires, television cameras, microphones and photographers. The petitioner, the panel of prospective jurors, who were sworn the second day, the witnesses and the lawyers were all exposed to this untoward situation.  The judge decided that the trial proceedings would be telecast."[15] *Id.* at 550-51.  The Supreme Court found that such media intrusion was inherently prejudicial due to its effect on the witnesses, the judge, the defendant, and, most significantly, on the "televised jurors," who "cannot help but feel the pressures of knowing that friends and neighbors have their eyes on them." *Id.* at 545.  Four of the jurors selected to hear the case had seen all or part of these pretrial broadcasts. *Id.* at 551.

The proceedings in *Sheppard* were even less conducive to a fair trial.  The trial was televised live; "bedlam reigned at the courthouse" and "newsmen took over practically the entire courtroom, hounding most of the participants in the trial"; a press table was erected within the bar, a few feet from the jury, at which twenty reporters sat "staring at Sheppard and taking notes."  384 U.S. at 355.  Their presence made it impossible for the defendant and counsel to converse privately, *id.* at 344, and there was "constant commotion within the bar,"

---

[15]    The Court further described the scene:

> [A]t least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table.
>
>                         . . .
>
> The petitioner was subjected to characterization and minute electronic scrutiny to such an extent that at one point the photographers were found attempting to picture the page of the paper from which he was reading while sitting at the counsel table.

*Estes*, 381 U.S. at 536, 538.

which caused "frequent confusion and disruption of the trial," *id.* at 355.  Outside of the courtroom, members of the media had "absolute free rein"; they thronged in the hallways and formed a "gantlet" through which participants in the trial, including the jurors, had to pass whenever they entered or exited the court.  *Id.* at 355.  Moreover, the jurors were photographed throughout the trial, with the judge's permission, and their pictures were printed in daily newspapers.[16]  *Id.* at 345. Taking all these circumstances into account, together with the massive and unfair media coverage discussed above, the Supreme Court found that "the state trial judge did not fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control the disruptive influences in the courtroom."  *Id.* at 363.

Nothing approaching this type of media circus or loss of control by the trial court occurred during Petitioner's trial.  As previously noted, the court allowed one television camera in the courtroom.  The court advised the press that they were not to take pictures of the jurors. (ME 3/5/90; RT 3/6/90 at 81.)  When presented with a report that one of the jurors might have been filmed, the court threatened to remove the cameraman from the courtroom:

> Before we begin with testimony, I want to cover something I shouldn't have to cover again because I went into it last week, and this is for the cameraman.  Open your ears and listen, please.  There are two rules concerning the use of a camera in this courtroom.  Number one, don't make a disturbance. Number two, don't photograph jurors. One of the jurors reports that jurors were recognizably seen in some footage that was aired.  That is inexcusable.  If you are smart enough to run that camera, you are smart enough to understand these two rules.
>
> .  .  .
>
> If you do it again, you'll pack up that camera and take it out of here. I don't want to have this problem again.

(RT 3/20/90 at 35-36.)

Petitioner cites the small pink bows reportedly worn by spectators as another factor contributing to an unfair courtroom atmosphere.  The Arizona Supreme Court considered this

---

[16]     As the Supreme Court also observed, Sheppard's trial began just two weeks before an election in which both the prosecutor and trial judge were candidates for judgeships. *Sheppard*, 384 U.S. at 354.

aspect of Petitioner's claim and concluded that "[t]he mere fact, if it is a fact, that spectators wore ribbons to trial does not mandate reversal." *Bible*, 175 Ariz. at 568, 858 P.2d at 1171. This decision is not an unreasonable application of clearly established federal law. *Musladin v. Carey*, 127 S. Ct. at 653-54 (because the Supreme Court had not yet addressed the effect on a defendant's fair-trial rights of private-actor, as opposed to state-sponsored, courtroom conduct, state court decision denying a claim based on the wearing of buttons displaying victim's photo was not contrary to clearly established federal law).

Petitioner also contends that the unfair atmosphere was exacerbated by Mr. Wilson's emotional outburst.[17]  Immediately following the incident, the judge commented:

> I think the record should reflect at this point that Richard Wilson went out of the courtroom obviously disturbed and yelled an obscenity which I'm sure the jury heard, as I did.  I think it might be well to remind the jury what you are told at the beginning of the case, which is that you are not to base your decision in this case on emotion or prejudice or sympathy, not to base it, but to base it on the facts.  You notice we don't tell you not to have emotion or not to have sympathy, just that you don't base your decision on that.  You base it on the facts that are presented in court, so please disregard the outburst.  I'm sure we can understand the feelings that were being vented, but that's not the way decisions are made.

(RT 3/28/90 at 205-06.)

At the conclusion of the day's testimony, defense counsel moved for a mistrial.  (*Id.* at 214.)  The court denied the motion, explaining:

> I don't think it's really the substance for a mistrial.  I don't think there is any doubt in the jury's mind about how Mr. Wilson feels about Mr. Bible.  That's certainly been clear for days.  It's just the venting of it in an inappropriate way that I think troubles us.

> I don't think the jury is going to make its decision based on what he said.  I think they will base it on the evidence.

> We do have to maintain an atmosphere of calm where we apply certain rules, see that the rules are followed in a civilized way.  We definitely don't want a trial turned into a shouting match.

> I think what we really need to be concerned about is that nothing like

---

[17]     The outburst occurred during the testimony of Petitioner's prior victim, who described being raped at knife-point by Petitioner.  After he left the courtroom, Mr. Wilson shouted, "That fucking asshole." (RT 3/28/90 at 205.)

- 29 -

this happen again.  I would be very troubled if there were more of this.

(*Id.* at 218.)

As already noted, based upon these concerns, the court barred Mr. Wilson from the remainder of proceedings, stating, "I don't see how I can risk a mistrial.  If there's another outburst like that, I might have to grant one.  Nobody here wants that.  It's better to be safe than sorry." (*Id.* at 221.)

The Arizona Supreme Court agreed with the trial court that this "serious but isolated incident by a murder victim's father" did not warrant a mistrial.  *Bible*, 175 Ariz. at 598, 858 P.2d at 1201.  The court reasoned:

> The substance of his comment and its context make clear that strong emotion prompted the outburst.  No information was conveyed other than the father's animosity toward Defendant, a feeling that could hardly have surprised the jurors.  In light of the nature of the outburst, the prompt instruction given the jury, and the exclusion of the victim's father from the remainder of trial, we do not believe that the trial court abused its discretion in denying the motion for mistrial.

*Id.*  This Court agrees.

The Seventh Circuit considered a similar, though more egregious, scenario in *Whitehead v. Cowan*, 263 F.3d 708, 723-26 (7th Cir. 2001).  Whitehead was accused of the aggravated kidnaping and murder of a five-year-old girl.  *Id.* at 716.  After the victim's mother took the stand to testify, the judge retired to chambers with counsel and the court reporter, leaving the witness, the defendant, and the jury in the courtroom.  *Id.* at 723.  While the judge was absent, the mother rose from the witness stand and began shouting at the defendant, asking him why he killed her daughter.  *Id.*  When the judge returned and discovered that the communication had taken place, he admonished the jury to disregard her comments.  *Id.* at 724-25.  The Court of Appeals held that the trial court's error in leaving the courtroom was not prejudicial and thus Whitehead was not entitled to federal habeas corpus relief.  *Id.*  The court explained that the mother's outburst communicated no extraneous or new information to the jurors, who were already aware of her feelings.  *Id.*  Additionally, the court noted, the comments were directed at the defendant, not the jury, and

1   the trial judge specifically instructed jurors to ignore any comments they heard. *Id.* Finally,

2   the evidence of the defendant's guilt was overwhelming. *Id.* For these reasons, the court

3   concluded that the outburst would not have affected the jury's verdict. *Id.*

4       This analysis applies with equal force to dispose of Petitioner's argument that Mr.

5   Wilson's outburst was unduly prejudicial. Mr. Wilson's comment was not directed at the

6   jury; it imparted no information beyond a father's personal feelings towards the person

7   accused of murdering his child; it was followed by an appropriate admonition from the court;

8   and the evidence of Petitioner's guilt was overwhelming.

9       Petitioner further contends that "the hostile courtroom atmosphere was reinforced by

10  the steady stream of emotion-laden, prejudicial testimony." (Dkt. 29 at 18.) He refers to the

11  reportedly tearful testimony offered by Mr. Wilson and law-enforcement personnel

12  concerning the discovery and removal of the child's naked, bound, and decomposing body

13  from the location where it was concealed beneath a pile of debris on top of Sheep Hill.

14      The Court rejects the claim that Petitioner's fair trial rights were violated when the

15  prosecutor presented this testimony. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643

16  (1974). First, the prosecutor did not act improperly in eliciting the testimony because the

17  discovery of the body, its identity and location, the description of the crime scene, and the

18  manner in which the body was removed were all highly relevant areas of testimony. The

19  case against Petitioner was based largely on physical evidence linking Petitioner to the crime

20  scene; the defense attacked the method in which those items of evidence were collected,

21  arguing that the investigation was unprofessional and that the scene was contaminated.

22  Therefore, the prosecutor was entitled to present testimony from the individuals present when

23  the body was discovered and the crime scene processed and to elicit an explanation for Mr.

24  Wilson's presence at the scene and his role in identifying his daughter's body and carrying

25  it down the hill. *See Hoxsie v. Kerby*, 108 F.3d 1239, 1243-44 (10th Cir. 1997) ("Although

26  the mother's testimony, which ended in an emotional breakdown in grief over the death of

27  her son, undoubtedly had an effect on the jury, her testimony was relevant to the identity of

28

the victim. Thus, we cannot fault the prosecutor for calling the mother as a witness."); *Willis v. Kemp,* 838 F.2d 1510, 1521 (11th Cir. 1988) (no prosecutorial misconduct where the victim's wife "became too emotional to continue her testimony" because the testimony was relevant to the identity of the victim). Second, Petitioner was not prejudiced by the emotional testimony because there was overwhelming evidence of his guilt and no reasonable probability exists that absent the displays of emotion which accompanied the otherwise relevant testimony the result of the trial would have been different. *Hoxsie*, 108 F.3d at 1244.

In sum, while this was a high-profile, emotionally charged case, there is no evidence that the proceedings devolved into a circus or that the trial judge was unable to control the proceedings. To the contrary, the record suggests that the judge was conscientious in maintaining order and decorum within his courtroom and minimizing the "risk . . . of impermissible factors coming into play." *Carey v. Musladin*, 127 S. Ct. at 653 (additional quotations omitted).

Conclusion:

The Arizona Supreme Court did not unreasonably apply clearly established federal law when it ruled that pretrial publicity did not require a change of venue and determined that Petitioner failed to show that he was prejudiced by the trial atmosphere. Therefore, Petitioner is not entitled to relief on Claims 1 and 2.

**Claim 4:        The trial court's failure to conduct an adequate voir dire violated Petitioner's Sixth and Fourteenth Amendment rights to a fair and impartial jury.**

Petitioner alleges that the voir dire process was inadequate because the trial court relied on a written questionnaire, did not allow individual voir dire, and did not inquire into the substance of the pretrial publicity to which venire members had been exposed. (Dkt. 29 at 22-24.)

State court decision:

On direct appeal, the Arizona Supreme Court rejected Petitioner's attack on the

adequacy of the voir dire process:

> Defendant requested individual, or small group, voir dire in camera. Voir dire examination of a juror or jurors apart from the others is designed to prevent panel contamination by inflammatory answers. Ariz.R.Crim.P. 18.5(d) comment; *see also Mu'min*, 500 U.S. at ----, 111 S.Ct. at 1905; *cf. State v. Clabourne*, 142 Ariz. 335, 344, 690 P.2d 54, 63 (1984) (comment by potential juror that "the entire defense was a lot of baloney" did not impermissibly contaminate the panel). In camera voir dire, most useful in cases involving massive publicity or "unusually sensitive subjects," is designed to encourage full disclosure "when the prospective juror might be embarrassed to confess his true opinion before an audience." Ariz.R.Crim.P. 18.5(d) comment. Either procedure can be very useful in appropriate cases. Whether to conduct such voir dire, however, is left to the trial court's discretion. *See* Ariz.R.Crim.P. 18.5(d).

> In this case, the written questionnaire addressed many of the questions that might normally militate in favor of individualized, panel, or in camera voir dire. Defendant cites no "contaminating" comment made during oral voir dire, and we find none. Nor can we say that any other reason required in camera voir dire. Whatever the risk of the procedure used, the danger did not materialize. Thus, the trial court did not abuse its discretion in denying Defendant's request.

> Defendant argues that the scope of oral voir dire was inadequate to secure an impartial jury. The questionnaire, the use of which was entirely appropriate in this case, constituted nearly all of the voir dire. The questionnaire not only revealed a great deal of relevant information from a large panel of prospective jurors but also enabled the trial judge to avoid infecting jurors with answers that necessarily would have been given to the same questions if propounded during oral voir dire.

*Bible*, 175 Ariz. at 570, 858 P.2d at 1173 (citations omitted). The court further explained that while a more extensive voir dire might have been advisable, Petitioner was precluded from challenging the adequacy of the process because he drafted the questionnaire, acceded to the court's proposed questions and comments, did not submit additional questions, and passed the panel. *Id.*

The court then continued its analysis, reviewing the voir dire process for fundamental error and finding none:

> Given the high profile of this case, the passions it stirred, and the pretrial publicity, if requested by Defendant, the court might well have conducted a more substantial oral voir dire. The record, however, does not show that any of the jurors seated demonstrated a closed mind; they all stated they could follow the court's instructions and decide the case on the evidence. While such statements are not always conclusive and are to be tested by voir dire, *Irvin,* 366 U.S. at 727-28, 81 S.Ct. at 1645, on this record rejecting these

- 33 -

statements would require sheer speculation on our part.

> Although not lengthy, there was some oral response from each member of the panel of thirty-four, allowing the parties to briefly observe their demeanor. Although two jurors had qualified opinions regarding guilt, one was drawn as an alternate. The other juror, who actually decided the case, indicated she could set aside her qualified opinion and decide the case on the trial evidence. Nothing of evidentiary value in this record shows that error, if any, in voir dire deprived Defendant of a fair trial. We find no fundamental error.

*Id.* at 572, 858 P.2d at 1175.

Analysis:

Claim 4 is governed by the clearly established law set forth in *Mu'Min v. Virginia,* 500 U.S. 415 (1991), where the Supreme Court held that voir dire questioning must cover "the subject of possible bias from pretrial publicity" but that due process does not require questions relating to the content of the publicity to which each juror has been exposed. *Id.* at 431. The Court found no error in the trial court's denial of individual voir dire and refusal to allow prospective jurors to be questioned about the specific contents of news reports. *Id.* at 422. The Court also explained that state trial courts "retain[] great latitude in deciding what questions should be asked on voir dire." *Id.* at 424. On habeas review, therefore, a federal court is limited to determining whether the trial court's failure to undertake a more thorough oral voir dire rendered Petitioner's trial "fundamentally unfair." *Id.* at 425-26.

The holding in *Mu'Min* disposes of this claim. As described above, the trial court used a detailed questionnaire, prepared by the defense, to determine, inter alia, the effect of exposure to pretrial publicity on the prospective jurors' attitude toward Petitioner and whether they had "such fixed opinions that they could not judge impartially the guilt of the defendant." *Mu'Min,* 500 U.S. at 430. After reviewing the questionnaires and making appropriate excusals, the court made further, oral, inquiries of the remaining venire members. This process resulted in a jury whose members each stated that they could hear the case in a fair and impartial manner. Neither additional nor individualized questioning was constitutionally required and the *voir dire* examination was not fundamentally unfair.

- 34 -

Because the Arizona Supreme Court reasonably applied *Mu'Min* in rejecting this challenge to voir dire, Petitioner is not entitled to relief on Claim 4.

**Claim 5:** **The trial court's failure to strike certain jurors for cause violated Petitioner's Sixth and Fourteenth Amendment rights.**

Petitioner alleges that his right to a fair and impartial jury was violated by the trial court's failure to strike the following jurors for cause based on the answers provided in their questionnaires: Tewahafta, who stated that he would weigh the testimony of law enforcement witnesses more favorably than that of other witnesses; Fairman, who responded that there was something about the case that would make it difficult or impossible to serve as a fair and impartial juror; and Scruggs and Roush, who both indicated that they had a "qualified" opinion regarding Petitioner's guilt.[18] (Dkt. 29 at 24-25.) During voir dire, Petitioner did not object to or challenge any of these jurors for cause.

Petitioner also contends that the court violated his rights by failing to remove juror Schweitzer. While testifying at trial, prosecution witness Robert Emerick, a counselor with the Department of Corrections, stated in open court that he knew Schweitzer. (RT 3/27/90 at 131.) Thereafter, at defense counsel's request, the court and counsel questioned Schweitzer in open court. Schweitzer indicated that he had been friends with Emerick in high school and college but that they had not kept n touch during the last "five, six, seven years." (*Id.* at 133.) He also stated that he would not view Emerick's testimony differently from that of any other witness. (*Id.* at 134.) Emerick stated that he had never discussed the case with Schweitzer. (*Id.*)

The court determined that Schweitzer could remain on the jury, finding that he "can be fair, and has never discussed the case with the witness." (ME 3/27/90 at 3.) Counsel subsequently moved to have Schweitzer drawn as an alternate. (RT 4/10/90 at 179.) After finding that Mr. Emerick's trial testimony was unrebutted and that the relationship between

---

[18]    At the conclusion of trial, Roush was selected as an alternate juror. (RT 4/11/90 at 194.)

1   Emerick and Schweitzer would not influence the juror, the court denied the motion.[19]   (*Id.*

2   at 180; ME 4/10/90 at 1-2.)  Schweitzer later became the jury foreman.  (*See* RT 4/12/90 at

3   26.)

4           State court decision:

5           On direct appeal, the Arizona Supreme Court rejected this claim.  Specifically, with

6   respect to jurors Fairman, Scruggs, and Roush, the court held:

7           Two of the jurors had "qualified" opinions as to guilt, meaning that they could
        "set aside that opinion and render a verdict based solely on the evidence
8       presented in court."  Similarly, several jurors indicated that, for one reason or
        another, they would find it difficult but not impossible to be fair and impartial.
9       Each of these jurors, however, believed that they could set aside their feelings,
        keep an open mind, sit fairly and impartially, and base their verdict solely on
10      the evidence presented at trial.  Failure to strike these jurors was neither error
        nor fundamental error.

11  *Bible*, 175 Ariz. at 573, 858 P.2d at 1176.  With respect to juror Tewahafta, who had

12  indicated that he would view the testimony of police officers with particular favor, the court

13  held:

14          This juror, however, indicated that he could fairly and impartially listen to and
15      weigh the evidence and render a verdict in accordance with the law.  He also
        understood that the State had the burden of proof beyond a reasonable doubt.
16      Furthermore, this juror expressed no disagreement with the presumption of
        innocence, the jury's duty to judge credibility, or the State's burden to prove
17      guilt beyond a reasonable doubt.  Although follow-up oral inquiry of this juror
        would have been appropriate, we find no fundamental error in allowing this
18      juror to sit.

19  *Id.*

20          The court also rejected Petitioner's claims regarding juror Schweitzer:

21          Although the juror's questionnaire disclosed that he knew many
        individuals (including law enforcement officers), it *did not* disclose his
22      knowledge of Mr. Emerick . . .  Although a juror's failure to disclose
        knowledge of a witness is a serious matter, it does not automatically require
23      disqualification.  In deciding whether a juror may continue to sit in this
        situation, the court must consider the relationship between the witness and the
24      juror, whether the juror will properly assess the testimony, the importance of
        the testimony, and whether the testimony is disputed.  The court must make a
25

26          [19]     The trial court also made the erroneous finding, based at least partly upon
27  defense counsel's representations, that Schweitzer had disclosed his relationship with the
    witness in his jury questionnaire.  (RT 4/10/90 at 180.)

28
                                        - 36 -

searching inquiry of the juror to apply these factors.

Defense counsel conceded that the trial court conducted "a rather in depth voir dire of the juror" after the disclosure. Although friends in high school and for two years in college, the witness and the juror had not spent time together for *at least* five years before trial. The juror stated that he would assess Mr. Emerick's testimony as he would any other witness and that he had not discussed with Mr. Emerick anything relating to the case or Mr. Emerick's work. Although important, as the trial court found, Mr. Emerick's testimony was unrebutted and was not at the core of the State's case. In sum, although it would have been better to have selected the juror as an alternate, *cf.* Ariz.R.Crim.P. 18.5(h), on these facts, the court did not abuse its discretion in denying Defendant's motion.

*Id.* at 574-75, 858, P.2d at 1177-78 (citations omitted).

Analysis:

Federal habeas relief may be granted based on a state court's failure to strike a juror for cause only where there is no fair support in the record for the trial court's determination that the juror was unbiased. *Wainwright v. Witt*, 469 U.S. at 424. As previously noted, a state court's determination of juror impartiality is entitled to a presumption of correctness on federal habeas review. *Id.* at 429; *cf. Uttecht v. Brown*, 127 S. Ct. 2218, 2224 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.").

As described above, and as indicated in the opinion of the Arizona Supreme Court, fair support for a finding of impartiality with respect to jurors Tewahafta, Fairman, Scruggs, and Roush is contained in the jurors' written responses and the oral voir dire. To the extent that the answers on a juror's questionnaire were ambiguous or inconsistent, such difficulties were resolved or offset by the juror's unequivocal, affirmative responses to direct inquiries into his or her ability to serve fairly and impartially.[20] Similarly, the court's colloquy with

---

[20] For example, juror Fairman's responses on the questionnaire were seemingly inconsistent. As Petitioner notes, she checked "Yes" when asked if there was "anything about the nature of the case that would make it difficult or impossible for you to serve as a fair and impartial juror?" She left the space for follow-up information blank, and answered "No" to the next question, asking whether she knew of "any reason whatsoever, whether the court has asked specifically about it or not[,] why you believe you cannot sit as a fair and

juror Schweitzer established fair support for a finding that his relationship with Mr. Emerick

would not prevent him from being a fair and impartial juror.

The Arizona Supreme Court's denial of this claim was neither contrary to nor an

unreasonable application of clearly established federal law.  Therefore, Petitioner is not

entitled to relief on Claim 5.

**Prosecutorial Misconduct and Judicial Bias**

> ***Claim 8:*** ***The prosecutor's repeated misconduct violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.***

Petitioner alleges that his constitutional rights were violated when the prosecutor

engaged in misconduct in his pleadings, during voir dire, in his opening statement, and in his

closing argument.

Clearly established federal law:

The appropriate standard of federal habeas review for a claim of prosecutorial

misconduct is "the narrow one of due process, and not the broad exercise of supervisory

power."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.

DeChristoforo*, 416 U.S. at 642) (petitioner not entitled to relief in the absence of a due

process violation even if the prosecutor's comments were "undesirable or even universally

condemned").  Therefore, in order to succeed on this claim, Petitioner must prove not only

that the prosecutor's remarks and other conduct were improper but that they "so infected the

trial with unfairness as to make the resulting conviction a denial of due process."  *Id.*; *see

Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases

in which the petitioner can establish that prosecutorial misconduct resulted in actual

prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. at 637-38); *Smith v. Phillips*, 455 U.S.

209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial

___

impartial juror on this case?"  Elsewhere, she indicated that she had no opinion regarding
Petitioner's guilt and that she would be able to set aside what she had heard about the case
and be fair and impartial.

misconduct is the fairness of the trial, not the culpability of the prosecutor").

In determining if Petitioner's due process rights were violated, the Court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly."   *United States v. Young*, 470 U.S. 1, 12 (1985).   To make such an assessment, it is necessary to place the prosecutor's remarks in context.   *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998).   In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence; whether the trial court gave a curative instruction; and "*the weight of the evidence against the petitioner*."   477 U.S.  at 181-82 (emphasis added).   Moreover, the Supreme Court has clearly indicated that the state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise."   *Donnelly,* 416 U.S. at 645; *see Slagle v. Bagley*, 457 F.3d at 501, 516 (6th Cir. 2006).

As set forth herein, the Court finds that Petitioner's individual claims of prosecutorial misconduct fail.  The Court also concludes that, considered cumulatively, the totality of the misconduct allegations do not establish entitlement to habeas relief.

State court decision:

On direct appeal, the Arizona Supreme Court, citing *Darden*, 477 U.S. at 181, denied relief on Petitioner's claims of prosecutorial misconduct.  *Bible*, 175 Ariz. at 600-03, 858 P.2d at 1203-06.   In reaching this determination, the court evaluated several specific allegations of misconduct, including claims that the prosecutor improperly commented on the quality of the questionnaire, vouched for witnesses, speculated that the victim was

tortured, and made references to the rights of the victim.[21] *Id.* While the court characterized almost all of these incidents as misconduct, it ruled that they did not constitute a denial of Petitioner's right to a fair trial. *Id.*

As set forth below, this Court concludes that the decision of the Arizona Supreme Court was not an unreasonable application of clearly established federal law. The Court will address Petitioner's allegations of prosecutorial misconduct in the order in which the incidents occurred.

Analysis:

A.    *Motions practice*

Petitioner alleges that the prosecutor improperly included inflammatory and inadmissible information in his pleadings – specifically, references to Petitioner's failed polygraph examination – for the purpose of prejudicing Petitioner in the view of the press and public. (Dkt. 29 at 30-32.)

The information about the results of Petitioner's polygraph examination was contained in the prosecutor's motion in limine to admit polygraph evidence at trial. (ROA 29.) Defense counsel protested the inclusion of such information in the State's filings, alleging ethical violations and moving for sanctions. (*See, e.g.*, ROA 68, 247.) The trial court denied the motion to admit polygraph evidence; it also denied Petitioner's motion to sanction the State. (*See* RT 10/26/89 at 233.)

Petitioner cites, and this Court has discovered, no precedent of the United States Supreme Court holding that the State violates a defendant's due process rights by supporting its filings with prejudicial facts. Moreover, Petitioner has not shown that he was prejudiced by the State's filings; as discussed above, a fair jury was empaneled. The Court concludes

---

[21]    The Arizona Supreme Court did not address some of the specific allegations of prosecutorial misconduct which Petitioner raised on direct appeal and repeats here. Because the state court did not provide a rationale for its resolution of those claims, this Court has independently reviewed the record to determine whether the state court's rejection of Petitioner's claims was objectively unreasonable under controlling federal law. *Pirtle*, 313 F.3d at 1167.

1    that the motion practice engaged in by the prosecutor did not deny Petitioner a fair trial.

2        *B.*        *Voir dire*

3        Petitioner alleges that the prosecutor engaged in misconduct during the first stage of

4    voir dire, prior to the filling out of the juror questionnaire, when he characterized as "silly"

5    the questions drafted by defense counsel and when he made a reference to "child rapists" and

6    "child murderers." (Dkt. 29 at 33-34.)

7        During his remarks to the panel members, the prosecutor stated that some of the

8    questions in the questionnaire "may seem a little silly to you, and some of them are silly, as

9    a matter of fact, but please be very honest when you fill out this form." (RT 2/27/90 at 10.)

10    He also explained, however, that the questionnaire was based on similar documents used in

11    other cases, that its purpose was to help ensure a fair trial for both sides, and that, "We want

12    fair people.  If you consider yourself to be a fair person, if you are willing to base your

13    verdict in this case solely on the evidence that comes from the witness stand, then we want

14    you as a juror." (*Id.*)  Thereafter, defense counsel told the venire members that he wrote the

15    questionnaire and took exception to its characterization as silly (*id.* at 16), and the trial court

16    explained, "I have gone through all of these proposed questions and approved them, so they

17    are approved questions by the Court.  Don't worry about what the attorneys think about

18    them.  I have approved them and they should all be answered by you truthfully." (*Id.* at 17.)

19        The Arizona Supreme Court found that the prosecutor's comment was "inappropriate"

20    but held that it "falls far short of actionable misconduct." *Bible*, 175 Ariz. at 601, 858 P.2d

21    at 1204.  This Court agrees that the comment, taken in context with the rest of the discussion

22    of the questionnaire, did not infect the trial with unfairness.

23        The prosecutor also made the following comments to the panel:

24        And another question that may be running through your mind is what
        about me, I don't like child murderers and child rapists; does that
25    automatically disqualify me from the jury?  I'd be prejudiced against a child
        murderer or a child rapist.
26
        No, that does not automatically disqualify you from the jury.  I don't
27    know anybody that doesn't dislike people who do those kind of things.  What

28                                - 41 -

you must promise to Judge Mangum and to us is that you will decide this case solely on the evidence that's presented at trial and not on any prejudice or anything like that.

(RT 2/27/90 at 12.)

These remarks occurred while the prosecutor was attempting to "answer just a couple questions that I know is [sic] running through a lot of your minds" about the qualifications for serving as a juror. (*Id.* at 11.) The comments came immediately after the prosecutor explained that mere exposure to publicity would not disqualify potential jurors if they could set aside what they had heard and decide the case solely on the evidence presented in court (*id.*), and immediately before his explanation that a potential juror's knowledge of members of the prosecution or defense team would likewise not automatically disqualify a member from serving on the jury (*id.* at 12). Given this context, it is apparent that the prosecutor's reference to "child rapists" and "child murderers" was an attempt, albeit inartful, to assure the venire members that their natural reaction to the crimes alleged against Petitioner would not serve as a disqualifying factor if they could set those feelings aside and judge the case fairly. The remarks did not infect the remainder of the trial with unfairness in violation of Petitioner's due process rights.

C.    *Opening statement*

Petitioner alleges that the prosecutor engaged in misconduct during his opening statement by improperly (1) assigning weight to DNA evidence, (2) mischaracterizing the prior bad act evidence, (3) commenting on defense strategy, (4) vouching for witnesses, particularly police officers, (5) emphasizing the victim's character, and (6) suggesting the victim was tortured.[22] (Dkt. 29 at 34-37.) The Court considers these allegations in turn.

*(1) DNA evidence:* In his opening statement the prosecutor offered the following comments during his discussion of the DNA evidence:

_____

[22]    The Court will consider an additional allegation of opening-statement misconduct, citing the prosecutor's request that the juror's "give justice" to the victim, in its discussion of the prosecutor's invocation of the victim's rights.

- 42 -

> I'm certain that you realize that if you find that the DNA is correct in this case
> that you're going to find Richard Bible guilty irregardless [sic] of the rest of
> the evidence, so it's very important that you listen to the experts that come in.
> We have experts.  Ricky Bible has hired experts to come in and attack the
> evidence.  You make up your mind.

(RT 3/6/90 at 128.)

From this context it is apparent that the gravamen of the prosecutor's remark (to the extent that one is discernible) is that the jurors should pay close attention to the expert testimony about DNA evidence because of its significance to the case.  The jury was exposed to days of testimony about DNA evidence, both its theoretical basis and its application to the evidence against Petitioner.  The Arizona Supreme Court held that the evidence was erroneously admitted but reviewed the remainder of the evidence against Petitioner and upheld the conviction.  Given this history, Petitioner has not shown that the prosecutor's convoluted reference to DNA evidence in his opening statement was improper; nor can this Court find that the comment infected the remainder of the trial with unfairness.

*(2)  Mischaracterizing prior act evidence:* Petitioner contends that the prosecutor misstated facts regarding the 1981 sexual assault by indicating that it occurred, like the murder of Jennifer Wilson, on top of Sheep Hill.  The Court finds that the prosecutor's remarks were not inaccurate or misleading.[23]  (*See* RT 3/6/90 at 128-30.)  Petitioner also asserts that the prosecutor misstated the law regarding the use of prior acts under Rule 404(b).  Again, the Court disagrees with this characterization of the prosecutor's comments; moreover, as discussed below, at the close of trial the court instructed the jury regarding the proper use of the evidence concerning the prior attack.  (RT 4/11/90 at 185.)  Finally, Petitioner alleges that the prosecutor tainted the jury with his comments about criminals who return to the scene of the crime and repeat their offenses, specifically "people . . . that will go back and rob the same Circle K that they got sent to prison for ten years before."  (*Id.* at

---

[23]   Moreover, in his closing argument, the prosecutor correctly noted that the prior incident occurred at the bottom of Sheep Hill while the murder of Jennifer Wilson occurred at the top.  (RT 4/11/90 at 16.)

129.)  The Court agrees that while the remark was of dubious propriety, its effect was innocuous, particularly given the fact, discussed below, that the 404(b) evidence was properly admitted as relevant to the issue of identity.

*(3)   Commenting on defense strategy:*  Petitioner contends that the prosecutor improperly commented on the defense strategy by characterizing it as an alibi defense and undermined defense counsel by telling the jury, "You know what his job is and I know what his job is, too, and he will do the best job he can for his client."  (RT 3/6/90 at 131.)  The comment about the alibi defense – "The defense in this case that I have been notified of is alibi" – was neither inaccurate nor improper.  The remark about defense counsel's role occurred as the prosecutor was explaining what evidence might be offered by the defense, with the prosecutor acknowledging that he was "not sure" what would be presented but that it was "his [Petitioner's] responsibility" and that "Mr. Koopman represents Mr. Bible."  (*Id.*)  Petitioner does not explain how these comments about the function and capability of defense counsel undermined counsel's credibility before the jury.  The jury was able to make its own judgments about counsel and the defense theory throughout a lengthy trial.  There is no showing that the prosecutor's brief remarks at the outset of the trial infected the remainder of the proceedings with unfairness.

*(4)   Vouching:*  One form of prosecutorial misconduct occurs when a prosecutor vouches for the credibility of a witness.  *See Young*, 470 U.S. at 18-19; *Lawn v. United States*, 355 U.S. 339, 359-60 n.15 (1958); *United States v. Berger*, 295 U.S. 78, 86-88 (1935).  "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony."  *United States v. Necochea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (citing *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)).  Vouching constitutes misconduct because it may lead the jury to convict on the basis of evidence not presented; it also carries the imprimatur of the government, which may induce the jury to adopt the government's judgment rather than its own.  *See Young*, 470 U.S.

1    at 18.

2        During his opening statement, the prosecutor declared:

3            I promise you that I'm gonna be honest with you, that the witnesses that
     I call, there is a reason for them to be here.  They have something important
4    to tell you.  I'm not gonna waste your time.  If there is [sic] two or three
     people that did the same thing in this case, you will probably only hear from
5    one of them.  It's gonna be a straightforward, no nonsense case.
                                  . . .
6
             But as you know, we wouldn't be here unless what I'm about to tell you
7    really happened.

8    (RT 3/6/90 at 88-89, 113.)

9        Petitioner alleges that these statements constituted improper vouching.  (Dkt. 39 at

10   34.)  The Arizona Supreme Court agreed that the statements were improper, but concluded

11   that they did not result in fundamental error.  *Bible*, 175 Ariz. at 601, 858 P.2d at 1204.  This

12   Court agrees that Petitioner's fair trial rights were not prejudiced by the prosecutor's

13   comments.

14       The former statement – "I'm gonna be honest with you . . . " – falls short of the type

15   of vouching for the credibility of a witness that courts have found constitutionally invalid.

16   *See United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (prosecutor "deliberately

17   introduced into the case his personal opinion of the witnesses' credibility" through comments

18   such as, "I think he [the witness] was very candid"); *United States v. Shaw*, 829 F.2d 714,

19   717 (9th Cir. 1987) (improper vouching occurred where the prosecutor implied that he would

20   be able to determine whether the witness was testifying truthfully); *Roberts*, 618 F.2d at 533

21   (improper for prosecutor to tell the jury that police were monitoring the trial to determine that

22   the witness testified truthfully); *compare Lawn*, 355 U.S. at 359 n.15 (comment during

23   closing argument that "we vouch for [the witnesses] because we think they are telling the

24   truth" did not deprive the defendant of a fair trial).  Indeed, when viewed in context, the

25   prosecutor's remarks do not constitute an assurance of any witness's credibility; instead, they

26   are an attempt to characterize his personal style (in contrast to what the jurors might have

27   seen on television shows like L.A. Law) and to indicate that he was attempting to streamline

28

                                     - 45 -

and make comprehensible an otherwise complex, emotional, and lengthy case.  (*See* RT 3/6/90 at 88-89.)

Similarly, a closer reading of the latter comment[24] reveals that it was not an improper testimonial to the strength of the State's case but rather an expression of wonder at the fortuitous circumstances which led, after a full-scale, three-week search by numerous law-enforcement agencies, to the discovery of the Jennifer Wilson's body.   The import, indisputably true, of the prosecutor's remark was that they would not all be gathered together for Petitioner's trial unless it "really happened" that two visitors to Flagstaff accidentally discovered the child's discarded clothes after their car broke down, they missed their swap meet, and they decided instead to go for a walk on Sheep Hill.

Petitioner further alleges that the prosecutor improperly vouched for the quality of the police investigation when he made the following comments in his opening statement:

> I'm telling you right now that the real defense in this case is not alibi.  The real defense is that the police should be out on trial, that they didn't do this right, that they goofed up part of the investigation, that they should have done more work, or that they should have done this or they shouldn't have done that.  It's a technique where you take the attention away from your client and you put it on the police.
>
> I'll let you be the judge of what the police did in this case.  They did a good job, and at the end I'm gonna argue with you strongly about that.
>
> It's easy to look back on an investigation that happened a year and a half ago and say, why didn't you do this and why didn't you do that, but all in all, by the time this trial is over with, you're gonna be satisfied with the job that the police did in investigating it.

(RT 3/6/90 at 131-32.)

It is clear that from the final paragraph that the purpose of these comments, at least in part, was to make a point about what the evidence would show at trial – i.e., that the police performed competently.   While the remainder of the remarks might have been more

---

[24] The unabridged sentence reads, "But as you know, we wouldn't be here unless what I'm about to tell you really happened, and that was on June 25th, 1988, two people had come up from Phoenix, Arizona, to do some work at a swap meet at what they call Big Tree Campground."  (RT 3/6/90 at 113.)  The prosecutor proceeded to describe the discovery of items of clothing on the hillside. (*Id.* at 113-15.)

appropriate for closing argument, they did not render Petitioner's trial unfair.   Because the defense did in fact challenge the adequacy of the investigation, the prosecutor was free to argue at closing that the defense critique was not supported by the evidence presented at trial.

*(5) Emphasizing the victim's character:* During his opening statement, the prosecutor described the victim as a "good girl" who "did what her parents told her to do," was a "good student" (RT 3/6/90 at 100), and came from a "good family" (*id.* at 95).  The comments about the victim occurred while the prosecutor was detailing the circumstances of the child's disappearance – specifically, the moment when Mrs. Wilson discovered the abandoned bicycle –  and directly preceded the prosecutor's statement that "[i]t would be very unusual for her just to walk off like that."  (*Id.* at 100.)  Thus, the characterization of the child as conscientious and obedient was not improper because it outlined the forthcoming relevant testimony, from Mrs. Wilson and various law-enforcement personnel, about the facts surrounding the child's abduction and the steps taken to search for her.  The Court also finds that the positive references to the Wilson family did not inflame the jury or render the trial unfair.

*(6) Suggesting the victim was tortured:*  In his opening statement, the prosecutor suggested that the victim was "perhaps tortured."  (RT 3/6/90 at 89.)   The Arizona Supreme Court found the comment improper, explaining that "[o]pening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *Bible*, 175 at 602, 858 P.2d at 1205.  The court concluded, however, that the comment did not deprive Petitioner of a fair trial because "it was a reasonable inference from evidence later introduced and would have been proper during closing argument."  *Id.*  This Court agrees.  The evidence produced at trial supported an inference that the child was subjected to several forms of abuse, both physical and psychological, before she was bludgeoned to

1    death.[25]

2         D.    *Closing argument*

3         Petitioner alleges that the prosecutors[26] engaged in misconduct during their closing

4    arguments by improperly (1) discounting the State's burden to prove each element of the

5    offenses charged, (2) misstating facts regarding blood found on Petitioner's vehicle, (3)

6    vouching for police officers, and (4) appealing to the jurors' emotions by referring to the

7    rights of the victim.  (Dkt. 29 at 36, 39-42.)  The Court considers these allegations in turn,

8    guided by the principle that "[c]ounsel are given latitude in the presentation of their closing

9    arguments, and courts must allow the prosecution to strike hard blows based on the evidence

10   presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th

11   Cir. 1996); *see Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005).

12        *(1) Discounting the State's burden of proof:*  In his closing argument, the prosecutor

13   told the jury that "[w]e all know what the issue is in this case, and it's not whether or not

14   Jennifer Wilson was molested and kidnapped and murdered.  The issue is, is the defendant,

15   Mr. Bible, the person that's guilty of the crime. . . ."  (RT 4/11/90 at 8.)  Referring

16   specifically to the charge of child molestation, Petitioner asserts that the prosecutor's

17

18        [25]    During closing argument the prosecutor remarked that the victim may have

19   been "forced into some sort of torment." (RT 4/11/90 at 175.)  The Arizona Supreme Court
     held that this comment was proper:

20        Unlike opening statements, during closing arguments counsel may summarize

21        the evidence, make submittals to the jury, urge the jury to draw reasonable
          inferences from the evidence, and suggest ultimate conclusions.   Given the

22        evidence presented at trial, we find no impropriety in the prosecutor suggesting
          – during closing argument – that the victim had been tormented.   The

23        nine-year-old victim was abducted, taken to a remote area, her clothes
          removed and scattered, her hands tied, and her head beaten. Such evidence

24        would permit a jury to infer that she had been subject to both physical and
          emotional torment.

25   *Bible*, 175 Ariz. at 602, 858 P.2d at 1205 (citations omitted).

26        [26]    The lead prosecutor, Fred Newton, made the opening statement and the initial

27   closing argument.  A second prosecutor, Camille Bibles, delivered the rebuttal closing
     argument.

28

                                        - 48 -

comment "discounted [the State's] responsibility to prove that the crimes occurred at all." (Dkt. 29 at 39.) The Court disagrees. The remainder of the prosecutor's comment reads as follows: " . . . so briefly I'm gonna go over the elements of the charges that we have against Mr. Bible, but I'm gonna focus – 90, 99 percent of my final argument is focused on who did it, and that's so that we don't waste a whole lot of time here." (RT 4/11/90 at 8-9.) The prosecutor then discussed the elements of each count, including child molestation. (*Id.* at 12.) Later, he discussed the evidence that supported the count. (*Id.* at 103-05.) After closing arguments, the court instructed the jury on the State's burden of proof:

> The law does not require a defendant to prove innocence. Every defendant is presumed by law to be innocent.
>
> The State must prove the defendant guilty beyond a reasonable doubt. This means the State must prove each element of the charges beyond a reasonable doubt.
>
> If you conclude that the State has not met its burden of proof beyond a reasonable doubt, then reasonable doubt exists and the defendant must be acquitted of that charge.

(*Id.* at 181-82.) The court then instructed the jury on the elements of each count, including child molestation. (*Id.* at 187.)

When taken in context with the remainder of the closing arguments and the court's instructions, the prosecutor's characterization of the main issue in the case being the identity of the murderer did not deprive Petitioner of a fair trial.

*(2) Misstating facts regarding blood on Petitioner's vehicle:* During his closing argument, the prosecutor discussed a blood smear found on the passenger door of Petitioner's vehicle: "there is a blood smear that can't be diagnosed, or whatever you want to call it, but it's human blood, I believe they testified they came up with. . . ." (RT 4/11/90 at 60.)

In fact, the State's experts testified at trial that they could not determine whether the blood stains found on the vehicle, including the smear on the interior passenger door, were from a human or animal source. (*See* 3/29/90 at 84-85.) The prosecutor's suggestion that human blood was found was therefore incorrect and misleading. However, it did not affect

Petitioner's fair trial rights because defense counsel brought the prosecutor's error to the jury's attention and used it effectively to challenge the credibility of the State's evidence during his closing argument.[27] (RT 4/11/90 at 150-51.) Also ameliorating any potential harm from the prosecutor's mischaracterization of the evidence was the equivocal nature of his description of the test results and the fact that the prosecutor himself advised the jury that he might make some mistakes in his presentation of the facts and emphasized that if what he said was at variance with what the jury recalled of the evidence, the jury should "go by what you remember."  (RT 4/11/90 at 8.)

*(3) Vouching for police officers:* Petitioner contends that the prosecutor improperly vouched for the law enforcement witnesses when he commented at the conclusion of his closing argument that "[t]hese poor police officers have been running down leads, doing things for me that you wouldn't believe, but the end result is here.  It's this piles [sic] of evidence, here, there, the diagrams, the videotapes, all the things that you need in this case to do the right thing."  (RT 4/11/90 at 109.)

The Court finds that the prosecutor's characterization of the police investigation did not constitute improper vouching for witnesses or violate Petitioner's right to a fair trial.  As

---

[27]     Informing the jury that the prosecutor "said something that angered me," defense counsel continued his attack on the prosecution's case:

He told you that [criminalist] Bob Blackett found human blood inside the vehicle 'cause under direct examination that was the, kind of the appearance that Blackett gave you folks.

It wasn't until I cross-examined him that he admitted that when he sent the stain over to [criminalist] Benita Harwood for further examination, she could not determine whether it was human or animal . . . .

Don't you think that the prosecutor was trying to prejudice you with that statement?  He even told you in his final argument that it was human.

Ladies and gentlemen, I suggest to you that the bloodstain . . . had nothing whatsoever to do, at least through the facts and evidence, nothing whatsoever to do with the death of Jennifer Wilson.

(RT 4/12/90 at 150-51.)

noted above, counsel are given wide latitude during closing argument.  *See, e.g.*, *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument.").  Here, the prosecutor's remarks were a response to the defense theory that the investigation was deficient and were based upon reasonable inferences from the evidence at trial.

*(4) Referring to the rights of the victim:* Petitioner alleges that his right to a fair trial was violated by comments concerning the victim's rights which the prosecution made during both opening statement and closing argument.  In his opening statement, the lead prosecutor stated:

> Mr. Bible deserves a fair trial, and I know you're gonna give it to him. I have no problem with that.  I understand the presumption of innocence.  I understand all the rights that a defendant have [sic], and I know you're gonna give him the full benefit of all those rights.
>
> But your goal is not necessarily just to give Ricky Bible a fair trial. Your goal in this case is going to be justice.
>
> And justice doesn't mean just giving Ricky Bible a fair trial.  It means looking at the rights of other people, too, like Jennifer Wilson, and those rights include those that are enumerated in the Declaration of Independence, life, liberty and the pursuit of happiness.  And there won't be any of that for Jennifer Wilson.

(RT 3/6/90 at 132.)

The second prosecutor also referred to the victim's rights during her rebuttal closing argument:

> Which brings me to a final point, as we talk about Jennifer Wilson.  It has been mentioned, and the State certainly agrees, the defendant and all defendants have rights and a right to a fair trial.
>
> There has been a fair trial.
>
> But there are other rights.  All of us have rights, including Jennifer Wilson.  Perhaps the most succinct rights, the most succinct discussion of the sort of rights that we all, including Jennifer Wilson, have, were described in the Declaration of Independence in 1776.
>
> . . .
>
> Jennifer Wilson's rights were terminated on June 6 of 1988.  She has no right to life.  That was terminated with blows to her head.  There is no liberty for a nine-year-old girl who is taken off of her bike, tied up and taken

- 51 -

away from her family.  And there certainly is no pursuit of happiness from the grave.

Our system and your job is to protect, is to find justice and truth, and I believe defense counsel cited to that in his closing argument. Your duty is to protect the defendant's rights and also Jennifer Wilson's rights.

(RT 4/11/90 at 178-79.)

The Arizona Supreme Court found the comments inappropriate but held that they did not deprive Petitioner of a fair trial.  *Bible*, 175 Ariz. at 603, 858 P.2d at 1206.  The court explained: "In this case, the preliminary and final jury instructions focused the relevant inquiry and helped ensure that Defendant received a fair trial. These instructions, coupled with the strength of the evidence against Defendant, show that Defendant was not denied a fair trial." *Id.*

This Court concludes that the decision of the Arizona Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law.  Prior to opening statements and after closing arguments, the court instructed the jury not to be "influenced by sympathy or prejudice."  (RT 3/6/90 at 78; RT 4/11/90 at 180.)  The court also explained: "In their opening statements and closing arguments, the lawyers have talked to you about the law and the evidence.  What the lawyers said is not evidence, but it may help you to understand the law and the evidence."  (RT 4/11/90 at 181).  Jurors are presumed to follow instructions from the Court.  *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citing *Marsh v. Richardson*, 481 U.S. 200, 211 (1987)); *see Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000); *Rodriguez v. Peters*, 63 F.3d 546, 565 (7th Cir. 1995).

In *Drayden*, the Ninth Circuit found that the prosecutor engaged in misconduct when he "delivered a soliloquy in the voice of the victim" during closing argument.  232 F.3d at 712.  The court concluded, however, that the prosecutor's "deplorable performance" did not so infect the trial with unfairness that the petitioner was entitled to habeas relief.  *Id.* at 713.  The court noted that the jury had been instructed that "statements made by the attorneys

- 52 -

during the trial are not evidence" and that the jury "must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Id.* "We presume that the jury followed the instructions," the court explained. *Id.*  The court also noted, as grounds for denying relief based upon prosecutorial misconduct, that "the evidence of Petitioner's guilt of first-degree murder was very strong." *Id.*; *see Hamilton v. Mullin*, 436 F.3d 1181, 1189-90 (10th Cir. 2006) (petitioner not prejudiced by prosecutor's improper statements during closing argument because there was uncontradicted evidence of his guilt).

Conclusion:

In sum, the Court rejects Petitioner's claim that he is entitled to habeas relief based upon prosecutorial misconduct.  The determination of the Arizona Supreme Court that Petitioner was not deprived of his right to a fair trial was neither contrary to nor an unreasonable application of clearly established federal law.  Particularly when evaluated in the light of the overwhelming evidence of Petitioner's guilt, the conduct engaged in by the prosecution, considered individually or in the aggregate, did not constitute a due process violation.  Claim 8 is denied.

**Claim 10:    The trial judge's bias violated Petitioner's Fifth and Fourteenth Amendment rights to a fair trial.**

Petitioner alleges that his right to due process and a fair trial was violated because the trial judge was biased, as evidenced by remarks made by the judge which improperly expressed dislike for Petitioner's attorneys.  Petitioner cites instances where the judge interrupted defense counsel's questioning or sua sponte objected to trial questioning. He also claims that certain of the judge's comments to counsel at sentencing had "a sarcastic edge, or worse" and cites examples of what he characterizes as insulting and unprovoked

comments made by the judge to counsel.[28]  (Dkt. 29 at 45.)

On direct appeal, Petitioner alleged that the trial judge expressed animosity toward him and defense counsel in violation of his due process rights.  The Arizona Supreme Court rejected Petitioner's claims of bias:

> A trial judge must control the courtroom to help ensure a fair trial.  Ariz.R.Evid. 611.  Trial judges "are not referees at prize-fights but functionaries of justice." *Johnson v. United States*, 333 U.S. 46, 54 (1948).  Judges must be impartial, and avoid any appearance of partiality.  A trial judge also must refrain from taking any action calculated to influence the jury or likely to prejudice the defendant.

> There is no indication that the trial judge's statements were either designed to prejudice or likely to do so.  Many of the judge's statements were calculated to prevent repetitive, irrelevant, or argumentative questioning.  The trial judge has discretion to do this even when the opponent does not object.  *See* Ariz.R.Evid. 611; *see also Johnson*, 333 U.S. at 54.  Within reason, a judge does not display bias or cause prejudice when acting sua sponte to control the courtroom and the trial.

> The only troublesome point is a statement the trial judge made to the attorney outside the presence of the jury while addressing a motion to continue.  The judge described another case in which that attorney had been denied a continuance and was forced to interview witnesses during recesses.  The judge then stated, "I can tell you the judges of this court thought that would teach you a lesson."  Contrary to this statement, deciding whether to grant a continuance involves "the interests of justice."  Ariz.R.Crim.P. 8.5(b).  The stakes are high in criminal cases, and critical decisions should not rest, in whole or in part, on an attempt to somehow teach an attorney a lesson.

> This statement, however, was made outside the presence of the jury and could not have prejudiced Defendant.  Furthermore, the record shows that the interjections made by the trial judge in the jury's presence did not unfairly prejudice Defendant.

*Bible*, 175 Ariz. at 595, 858 P.2d at 1198.

Analysis:

A defendant is entitled to a fair trial, free from judicial bias.  *In re Murchison*, 349

---

[28]     The remarks at issue were directed primarily at Mr. Phillips and were made outside the presence of the jury.  In one instance, the judge told Phillips that he was "sick of lawyer games."  (RT 3/28/90 at 15.)  At another point he criticized Phillips for failing to follow "elemental procedure." (RT 6/11/90 at 10.)  The judge also expressed exasperation when responding to counsel's motion to voir dire the judge concerning possible ex parte contacts with the victim's family and regarding his views on the death penalty.  (*Id.* at 17-18.)

U.S. 133, 136 (1955).  There is a presumption that judges are unbiased, honest, and have integrity. *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  A petitioner may show judicial bias in one of two ways, by demonstrating the judge's actual bias or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity (i.e., a substantial likelihood of bias). *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994); *Fero v. Kerby*, 39 F.3d 1462, 1478-79 (10th Cir. 1994).  The Supreme Court has explained that a showing of bias cannot be based merely upon the tenor of a judge's remarks:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible . . . . *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display.  A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune.

*Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

None of trial judge's comments demonstrate or even suggest actual bias or a substantial likelihood of bias.  The judge's remarks did not originate from an extra-judicial source, but were responses to incidents that occurred during the proceedings.  As the Arizona Supreme Court noted, many of the complained-of comments did not take place before the jury, so they did not prejudice Petitioner. *Bible*, 175 Ariz. at 595, 858 P.2d at 1198.  Finally, the remarks did not reveal favoritism or a meaningful degree of antagonism toward the defense, but instead, as Petitioner acknowledges (Dkt. 29 at 44), demonstrated frustration with only one of Petitioner's attorneys. *Cf. United States v. Burt*, 765 F.2d 1364, 1368 (9th Cir. 1985) (for disqualification purposes, "[p]ersonal bias or a prejudiced attitude must be against the party, not against the attorney for the party").  Also militating against a finding of bias is the fact that the judge often expressed impatience with the prosecutors as well (*see, e.g.*, RT 1/26/90 at 58; RT 4/4/90 at 141) and issued many evidentiary rulings that favored

the defense (*see, e.g.*, RT 3/23/90 at 46, 80; RT 6/4/90 at 26).

The decision of the Arizona Supreme Court rejecting Petitioner's claim of judicial bias was not an unreasonable application of clearly-established federal law. Petitioner is not entitled to relief on Claim 10.

**Evidentiary Rulings**

In general, state law matters, including a trial court's evidentiary rulings, are not proper grounds for habeas corpus relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (internal quotation omitted); *see Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir. 1991). Only if the admission of the evidence was so prejudicial as to offend due process may the federal courts consider it.[29]  *Id.*

> **Claim 14:    *The trial court's admission of hearsay statements by the victim's mother violated Petitioner's Sixth and Fourteenth Amendment rights.***

The trial court excluded Mrs. Wilson's testimony regarding her description of the

---

[29]    The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling v. United States,* 493 U.S. 342, 352 (1990). Pursuant to this narrow definition, the Court has declined to hold, for example, that evidence of other crimes or bad acts is so extremely unfair that its admission violates fundamental conceptions of justice. *Estelle v. McGuire*, 502 U.S. at 75 & n.5; *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967). Thus, there is no clearly established Supreme Court precedent which holds that a state violates due process by admitting evidence of prior bad acts. *See, e.g.*, *Bugh v. Mitchell,* 329 F.3d 496, 512-13 (6th Cir. 2003) (state court decision allowing admission of evidence pertaining to petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent because there was no such precedent holding that state violated due process by permitting propensity evidence in the form of other bad acts evidence). Pursuant to these principles the Court notes that Claim 12, which alleged that Petitioner's rights were violated by admission of evidence concerning the 1981 offense and which the Court dismissed as procedurally barred, is without merit.

1   vehicles and drivers she saw around the time of her daughter's abduction.[30]  However,

2   pursuant to the excited-utterance exception to the hearsay rule, Arizona Rule of Evidence

3   803(2), the court allowed police officers and Richard Wilson to testify regarding Mrs.

4   Wilson's pre-hypnotic statements.  (RT 3/5/90 at 100; *see, e.g.*, RT 3/13/90 at 14-15.)

5   Petitioner alleges that his Sixth Amendment right to confront witnesses was violated by the

6   trial court's admission of this evidence.

7       The Arizona Supreme Court rejected this claim on direct appeal, holding that the

8   challenged testimony fit within a firmly-rooted exception to the hearsay rule and therefore

9   Petitioner's confrontation rights were not violated.  *Bible*, 175 Ariz. at 596, 858 P.2d at 1199

10  (citing *White v. Illinois*, 502 U.S. 346 (1992), and *Ohio v. Roberts*, 448 U.S. 56 (1980)).

11      At the time of Petitioner's conviction, the controlling law was defined by *Ohio v.*

12  *Roberts*, which conditioned "the admissibility of all hearsay evidence on whether it falls

13  under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of

14  trustworthiness.'" *Crawford v. Washington,* 541 U.S. 36 (2004) (quoting *Roberts*, 448 U.S.

15  at 66). So-called "excited utterances" were considered to be a firmly rooted hearsay

16  exception and the admission of such testimony did not, as a general rule, violate the

17  Confrontation Clause.  Subsequently, in *Crawford*, the Supreme Court expressly overruled

18  *Roberts* and held that it is a violation of the Sixth Amendment Confrontation Clause to admit

19  testimonial evidence at trial unless the declarant is unavailable and there was a prior

20  opportunity to cross-examine him or her.  541 U.S. at 68.  However, in *Whorton v. Bockting*,

21  127 S. Ct. 1173, 1184 (2007), the Supreme Court concluded that *Crawford* does not apply

22  retroactively to cases on collateral review.

23      As noted, in considering this claim the Arizona Supreme Court applied the holding

24

25      [30]     On the day after her daughter's disappearance, Mrs. Wilson underwent
26  hypnosis in an attempt to recall in more detail the vehicles she had observed the previous
    morning.  After extensive litigation of the issue, the State determined that it would not
27  present testimony from Mrs. Wilson concerning either her pre- or post-hypnotic descriptions
    of the vehicle.  (ME 3/14/90.)

28

in *Roberts*.   Because *Roberts* was the controlling precedent at the time, and because *Crawford* cannot be applied retroactively, this Court reviews the Arizona Supreme Court's decision under the "unreasonable application" standard of § 2254(d)(1).

In rejecting Petitioner's challenge to the admissibility of the Mrs. Wilson's hearsay statements, the Arizona Supreme Court explained that the testimony fit squarely within the excited-utterance exception:

> Distraught and fearful because her daughter was missing, the victim's mother described the vehicles and their drivers to law enforcement officers shortly after she observed the passing vehicles.   By so doing, she attempted to assist the officers in finding her daughter; she had every motive to be accurate and tell the truth and none at all to fabricate or alter her description.   Clearly the victim's mother was speaking in a state of excitement likely to ensure spontaneity.

*Bible*, 175 Ariz. at 596, 858 P.2d at 1199.

This determination, which accurately describes the conditions under which Mrs. Wilson's statements were made (*see* RT 3/7/90 at 81; RT 3/13/90 at 14-15), is not an unreasonable application of the clearly-established federal law set forth in *Roberts*.   Further, the admission of the testimony was not so prejudicial as to violate Petitioner's due process rights.   As the state court noted, Mrs. Wilson's initial statements to the officers bore significant indicia of reliability, and in any event her description of the vehicle and driver constituted a minor component of the otherwise overwhelming case against Petitioner.

Petitioner is not entitled to relief on Claim 14.

**Sufficiency of Evidence**

In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the Supreme Court set forth the standard to be applied to a habeas petitioner's challenge to the sufficiency of the evidence supporting his conviction.   Under this standard, there is sufficient evidence if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Id.*   The "rational factfinder" standard also applies to federal habeas review of a state court's application of an aggravating circumstance.   *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990).

***Claim 17:*** ***Petitioner's rights under the Eighth and Fourteenth Amendments were violated by the trial court's finding that the murder was especially cruel.***

Petitioner alleges that a rational fact-finder could not have determined that the murder of Jennifer Wilson was committed in an especially cruel manner.  (Dkt. 29 at 89-91.)  The Court disagrees.

In sentencing Petitioner, the trial court found that the murder of was committed in an especially cruel manner,  under A.R.S. § 13-703(F)(6), in that "[t]he suffering of the victim was enormous, considering the length of her suffering, the mental distress and the physical pain she endured." (Special Verdict, 6/14/90.) On direct appeal, the Arizona Supreme Court concluded that there was insufficient evidence to support a finding that Jennifer was conscious when the blows to her head were struck, but nevertheless affirmed the trial court's application of the (F)(6) factor:

> The victim's clothes were removed intact, without being torn or cut, thus indicating her hands were tied after she was naked. The fact that her hands were bound indicates that she was conscious and tied-up to prevent struggling. There would be no need to bind an unconscious victim. Her hands were bound tightly, leaving indentations on her wrists observable more than three weeks later.  Reasonable inferences from this evidence are that the victim was alive, conscious, and stripped before she was bound and that she was conscious when bound.
>
> This evidence strongly supports a finding that a conscious nine-year-old victim suffered physical and, even more, mental anguish before being killed. Obviously, the victim would have been terrified. Nor can it be argued that the mental and physical pain inflicted was unforeseen or fortuitous. Thus, we find that the killing was especially cruel.

*Bible*, 175 Ariz. at 604-05, 858 P.2d at 1207-08 (citations omitted).

This decision was not contrary to or an unreasonable application of clearly established federal law.  Based upon the circumstances of the girl's abduction and death, a rational fact-finder could readily have determined beyond a reasonable doubt that Jennifer Wilson suffered both physical and mental pain before she was killed.  Therefore, Petitioner is not entitled to relief on Claim 17.

**Ineffective Assistance of Counsel**

Petitioner alleges that he was denied his right to the effective assistance of counsel during both the guilt and sentencing stages of his trial.  The overarching theme of Petitioner's claims of ineffective assistance of counsel ("IAC") is that he was denied continuity of representation by experienced and competent counsel.

Background:

Petitioner was indicted on August 4, 1988.  (ROA 5a.)  The newly-formed Coconino County Public Defender's Office was appointed to represent him.  (*See* ME 8/5/88.)  Danny L. Cowser, head of the office, and Josephine Sotelo, a recent law school graduate with a background in biology, were assigned to the case.  (*See* RT 8/30/89 at 126-30.)

Ms. Sotelo, to whom the bulk of the work appears to have been delegated (*id.*), came to feel that the demands of the case exceeded her experience and ability and resigned from the office in early May 1989.  (*Id.* at 132-34, 144-46.)  Lee Phillips, a part-time attorney with the Public Defender's Office, became involved in the case at the beginning of May 1989. (*See* RT 5/1/89; RT 9/6/89 at 291.)  Mr. Phillips had some background in criminal defense but no experience with capital cases; he was also burdened with a heavy caseload.  (*See, e.g.*, RT 9/6/30 at 283-85, 320.)  Mr. Cowser left the Public Defender's Office in July 1989.  (RT 9/6/90 at 291.)  Jacqueline Hatch, an attorney with the Public Defender's Office, became involved in the case in July 1989.  (8/30/89 at 121.)

On June 1, 1989, Petitioner filed a pro per motion alleging that he was not receiving adequate representation and requesting the appointment of an additional attorney from outside the Public Defender's Office.  (ROA 304.)  The court denied the motion, noting that the office was in the process of hiring new attorneys.  (ME 7/28/89.)  Mr. Phillips moved for a six-month continuance of the September 12, 1989, trial date.  (ROA 327.)  The court held a two-day hearing and thereafter granted the motion, setting a new date of March 6, 1990. (ME 9/6/89.)  The court subsequently granted Mr. Phillips's request for the appointment of additional counsel; the court also authorized the appointment of an outside investigator,

Vanessa Lawson.[31]  (ME 9/11/89.)  On November 1, 1989, the court appointed Francis Koopman, an experienced criminal defense attorney (*see, e.g.*, RT 2/21/90 at 53-54), to serve as lead counsel (*id.* at 44; se ME 11/6/89.)  During their representation of Petitioner, Mr. Koopman and Mr. Phillips had disagreements about strategy (*see, e.g.*, ROA 487; RT 2/20/90), as did Mr. Koopman and Ms. Lawson (*see* RT 2/21/90 at 46).

On February 15, 1990, Petitioner filed another pro per motion, alleging ineffective assistance of counsel and seeking a continuance.  (ROA 484.)  The court again held an evidentiary hearing, at which Petitioner called for testimony from Ms. Lawson, Mr. Phillips, and Mr. Koopman.  (RT 2/21/90.)  The court denied Petitioner's motion, rejecting each of Petitioner's argument concerning the inadequacy of his representation – e.g., that witnesses had not been interviewed, that counsel were not prepared to handle the DNA evidence at trial, that Mr. Koopman was not committed to the defense, and that Mr. Phillips had been denied funding to interview out-of-state witnesses.  (ME 2/21/90.)  The court concluded by finding that "Mr. Koopman, as well as Mr. Phillips, are competent attorneys, and prepared for trial."  (*Id.*)

During the twenty months between indictment and trial, defense counsel engaged in a extensive motions practice.  Among the issues litigated were numerous discovery motions filed by the defense, motions to suppress evidence, the admissibility of evidence concerning Petitioner's 1981 conviction, a motion to disqualify the prosecutor, a motion to dismiss the molestation count, the admissibility of Petitioner's polygraph results, the admissibility of Mrs. Wilson's pre- and post-hypnotic testimony, the admissibility of gruesome photos, the defense motion to exhume Jennifer Wilson's body, change of venue motions, and, most

---

[31]     Prior to the appointment of Ms. Lawson, James Epperman and Steve Weems, investigators with the Public Defender's Office, were assigned to Petitioner's case. (*See* RT 8/30/89 at 40, 110.) As of February 21, 1990, Ms. Lawson had dedicated 1000 to 1500 hours to the case, including 400 hours of field work. (RT 2/21/90 at 18, 25.) Mr. Epperson put in approximately 500 hours on the case, about fifty of which consisted of field work. (8/30/89 at 54-55.)  However, both Ms. Lawson and Mr. Epperson felt that their efforts were inadequate. (*Id.* at 55-69; RT 2/21/90 at 18-23.)

significantly, the admissibility of the DNA and other scientific evidence.

To assist in the litigation of issues concerning the scientific evidence, defense counsel sought and the court approved the appointment of numerous experts, including William Thompson, Randy Libby, Simon Ford, Peter Barnett, Kris Sperry, Ed Blake, Benjamin Grunbaum.   (ME 3/15/89.)   The court held a three-day evidentiary hearing on the admissibility of the PGM evidence taken from "stale" blood samples (RT 1/26/89-1/27/89, 2/2/89) and a four-day *Frye* hearing on the admissibility of the DNA evidence (RT 2/21/89-2/24/89).[32]

During trial, the testimony relating to DNA evidence occurred over a period of eight days.   (RT 3/21/90-3/23/90, 3/27/90-3/28/90, and 4/4/90, 4/6/90, and 4/10/90.)   Defense counsel Phillips's vigorous challenge to the DNA evidence included a two-day cross-examination of the State's chief expert.   (RT 3/22/90-3/23/90.)   The defense also presented two of its own expert witnesses, Drs. Mueller and Libby.   (RT 4/4/90, 4/6/90.)

Clearly established federal law:

For IAC claims, the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  466 U.S. at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*  For example, while trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular

---

[32]      Ms. Sotelo acted as lead counsel during these hearings.  At trial, Mr. Phillips' was responsible for the DNA testimony, while Mr. Koopman handled the balance of the case.

investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.  To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted).  As the Supreme Court recently reiterated, "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" and by applying deference to counsel's judgments.  *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689).

Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  *Strickland*, 466 at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").  A petitioner must affirmatively prove prejudice.  *Id.* at 693.  To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  The calculus involved in assessing prejudice "should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  *Id.* at 695.

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  In answering that question, a reviewing court necessarily considers the strength of the state's case.  *See Allen v. Woodford,* 395 F.3d 979, 999 (9th Cir.

2005) ("even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"); *Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997) (where state's case is weak, there is a greater likelihood that the outcome of the trial would have been different in the absence of deficient performance). *See also Morales v. Ault*, 476 F.3d 545, 551-53 (8th Cir. 2007); *Snow v. Simmons*, 474 F.3d 693, 720-33 (10th Cir. 2007); *Atwater v. Crosby*, 451 F.3d 799, 810-11 (11th Cir. 2006); *Lundgren v. Mitchell*, 440 F.3d 754, 775-77 (6th Cir. 2006); *Leal v. Dretke*, 428 F.3d 543, 549-52 (5th Cir. 2005); *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001); *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999); *Huffington v. Nuth*, 140 F.3d 572, 580-83 (4th Cir. 1998); *United States v. Taveras*, 100 F.3d 995, 999 (C.A.D.C. 1996); *Scarpa v. DuBois*, 38 F.3d 1, 16 (1st Cir. 1994).

Also inherent in the prejudice analysis demanded by *Strickland* is the principle that in order to demonstrate that counsel failed to litigate an issue competently, a petitioner must prove that the issue was meritorious. *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986). Thus, with respect to allegations that counsel was ineffective for failing to file a motion, in order to demonstrate prejudice a petitioner "must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Morrison,* 477 U.S. at 373-74); *see Boyde v. Brown*, 404 F.3d at 1173-74. Therefore, in evaluating a number of the following IAC claims, this Court is informed by the holding of the Arizona Supreme Court on the merits of the underlying issues.

Finally, the Court notes that under the AEDPA, its review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). In order to merit habeas relief, therefore, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

State court decision:

Petitioner raised his IAC claims in a 123-page PCR petition filed on November 29, 1997. He supported the petition with a number of documents, including affidavits from participants in Petitioner's trial. First, Judge Mangum attested that he would have sustained certain objections if defense counsel had made them during trial, that he would have allowed evidence that someone else had committed the murder upon a proper showing that such evidence was credible, and that he found defense counsel's Rule 404(b) motion to be poorly written and argued. (PCR petition, Ex. A.) Next, Mr. Phillips attested that he was not qualified or prepared to handle Petitioner's case, especially with respect to the DNA evidence. (*Id.*, Ex. B.) Ms. Lawson likewise attested to the inadequacy of her investigative efforts, including the defense team's failure to prepare a case in mitigation, and stated that after Petitioner's sentencing she located a potential witness who believed her husband committed the murder. (*Id.*, Ex. C.) Finally, Mr. Koopman attested that he was not aware during trial of the potential witness discovered by Ms. Lawson. (*Id.*, Ex. G.)

Petitioner also presented affidavits from Mary Durand, a mitigation specialist, who attested that "the mitigation presentation" offered on Petitioner's behalf was "totally inadequate" (*id.*, Ex. D) and from Dr. Richard Lanyon, a psychologist, who stated that some of the circumstances allegedly experienced by Petitioner in his childhood might have warranted a neuropsychological examination (*id.*, Ex. E).

Finally, Petitioner presented documents containing potentially exculpatory information, including statements from individuals who reported seeing a girl who resembled the victim in the days after her disappearance. (*Id.*, Exs. H, I, J.)

The PCR court, applying *Strickland*'s two-pronged standard, rejected Petitioner's IAC claims. (ME 11/24/97at 6.) The court also concluded that Petitioner was not entitled to an evidentiary hearing because he failed to present a "colorable" claim. (*Id.*)

The Court must now determine whether the PCR court reasonably applied *Strickland* in its rejection of the following claims.

1
2

**Claim 3:** **Defense counsel performed ineffectively by failing to seek remedial or preventative measures to prevent improper influence on the jury.**

3     Petitioner alleges that counsel performed ineffectively by "failing to ask the court to
4 take steps to maintain a non-partisan and impartial atmosphere in the courtroom." (Dkt. 29
5 at 21.)   The only specific deficiency Petitioner cites is counsel's failure to move for
6 sequestration of the jury.

7     The PCR court rejected this claim, finding that Petitioner had shown neither deficient
8 performance ("[w]hether to request sequestration is a matter of trial strategy") nor prejudice.
9 (ME 11/24/97 at 3.)  With respect to prejudice, the PCR court noted that "Petitioner has not
10 made any showing that the jury was tainted by publicity during his trial or that there was any
11 disobedience to the [trial] Court's admonition which, if true, was prejudicial to him." (*Id.*)
12 The court also noted that decisions regarding sequestration are left to the discretion of the
13 trial court. (*Id.*)

14     Petitioner offers nothing to support the allegation that counsel's performance
15 regarding the sequestration issue was constitutionally ineffective.  Prior to voir dire, the
16 prosecutor suggested to the court and defense counsel that if publicity about the case reached
17 a certain point they may need to discuss sequestration. (RT 3/6/90 at 9.)  The judge
18 concurred, and indicated that he was closely monitoring media coverage of the proceedings.
19 (*Id.*) Defense counsel proposed that the court issue "an appropriately strong admonition"
20 which would note the high-profile nature of the case, but stated that "I think at this point in
21 time I don't see any need for asking for sequestration of the jury." (*Id.* at 9-10.)  The court
22 agreed to provide an enhanced admonition. (*Id.* at 10.)  Counsel then urged the court "to
23 admonish them not only do they not discuss the case with, amongst themselves or with their
24 friends or family, but do not under any circumstances discuss the case or their feelings with
25 the members of the press." (*Id.*)  He further advocated that the court "might talk to some of
26 the more prominent press people and advise them to please stay away from the jurors." (*Id.*)
27 The prosecutor and the court agreed with these suggestions, with the court indicating that "I

28

know the local reporter who is covering the trial . . . and he is well versed in this . . . [a]nd I know some of the other media people are experienced, but I think we can cover this adequately." (*Id.*)  The court subsequently provided the jury with a lengthy admonition to avoid media coverage of the case.[33]

As the PCR court noted, Petitioner, who does not allege juror misconduct or disobedience of the court's admonitions, cannot show that he was prejudiced by defense

---

[33]     Prior to opening statements, the court admonished the jury not to discuss the case and to avoid publicity:

> Now I think this is especially important in this case.  This is a high publicity case.  It will be covered in the media, and I think you have to be watchful.  There is a TV camera in here right now.  There are reporters here.
> Please don't read, listen to, or observe any newspaper, radio, or television account of the trial while you're sitting here as a juror.  And you will know the facts better than anybody.  There is no reason to try to get the facts out of the news because you're right here hearing every word and seeing those witnesses and looking at the exhibits.  What we really don't want you to pick up on is somebody else's opinion of what the facts are or what the facts mean.  You have to form your own opinions.  It has to be yours.  It has to come from your heart and your conscience, and we don't want you influenced by anybody else, until you go into the jury room at the very end of the case, and then you can talk to each other and share your opinions and reach your verdict, but until then, you should base your decision in this case only on what you hear in the courtroom.
> Here, it's controlled.  Anybody who testifies will testify under oath.  I'm here to be sure the rules are followed.  The lawyers are here to be sure that the rules are followed.
> Out on the street, there are no controls, so you are on your honor not to talk about this case, read about it, listen to anything that's said about it and so forth.  It really is important, believe me.

(RT 3/6/90 at 80-81.)  After opening statements the court repeated its admonishment:

> I'll send you home now with just a reminder about this case from start to finish, and that is not to read anything about it, listen to it on the radio or TV.   If you're interested, just have your wife or somebody save the newspapers.  You can read them after the trial is over.  If you have a VCR, you can record, you know, and look at that later.  Just don't look at anything while the trial is going on.
> It's your opinion that counts, nobody else's.  Nobody else will hear the facts as you do, so we expect that you will live up to your juror's oath to follow the rules, and that is an important one for you.

(*Id.* at 139-40.)  Throughout the trial, the court continued to admonish the jury to avoid media coverage of the case.  (*See* RT 3/9/90 at 216-17, 3/13/90 at 238-39, 3/29/90 at 176, 4/6/90 at 179.)

counsel's performance.   Having failed to demonstrate that the jury was exposed to publicity during the trial, Petitioner cannot establish that sequestration was necessary to prevent such exposure.[34]

Because the PCR court reasonably applied *Strickland* when it denied this claim, Petitioner is not entitled to relief on Claim 3.

### Claim 6:        *Defense counsel performed ineffectively by absenting himself during a crucial portion of voir dire.*

On February 26, 1990, the court met with counsel to discuss the procedure to be followed the next day, when the prospective jurors would fill out the jury questionnaire.  The court asked whether counsel wanted "to sit there for the whole process or simply leave once they begin filling out the questionnaires." (RT 2/26/90 at 4-5.) The prosecutor indicated that he would like to leave. (*Id.* at 5.) Mr. Koopman explained: "I really don't want Ricky sitting there for an hour or whatever it takes . . . because I think he's not gonna make a good impression . . . . So I think once the preliminary statements are made and the parties are introduced that I would prefer that we be allowed to leave." (*Id.*)  He stated, however, that if the prosecutor decided to remain or left a representative present while the questionnaires were being filled out, he would stay as well. (*Id.* at 6.)

The following day, after the questionnaires were distributed, the court informed the panel members:

> We have talked about this, and we don't think there is any need really for the defendant and the attorneys to stay here and simply watch you fill out these questionnaires.  There is no point in that.
>
> I will stay here in case there are some questions, and that would be simply like what does this question mean.

(RT 2/27/90 at 19.)

After the court completed its introductory remarks and counsel made their preliminary

---

[34]        Moreover, Petitioner has not presented any evidence that the trial court would have granted a motion for sequestration if one had been made. Judge Mangum's affidavit does not address the issue of sequestration.  (PCR petition, Ex. A.)

1   statements, the court stated, "If counsel and the defendant want to leave at this time, you

2   may.  I will stay here in case there is another question of some kind."  (*Id.* at 24.)  Counsel

3   and Petitioner then left.  Thereafter, the court fielded a number of questions from the

4   prospective jurors.

5         The PCR court rejected the claim that counsel's decision to absent himself while the

6   panel members completed their questionnaires constituted ineffective assistance:

7         Petitioner in effect asks the Court to presume prejudice and he does not
         provide the Court with any basis which if proved true, would probably have
8         impacted the eventual outcome.  Moreover, as said by the Supreme Court,
         there was no impropriety in the trial judge's response to the questions raised
9         after Defendant and defense counsel left the courtroom.[35]

10  (ME 11/24/97 at 2.)

11        The PCR court reasonably applied *Strickland* when it rejected this claim.  Petitioner

12  has not met his burden of showing that counsel's performance in this instance was

13  prejudicial.

14        Petitioner's claim that counsel could have garnered valuable information about the

15  jurors if he had remained for the full session is belied by the record.  Petitioner supports this

16  _____

17        [35]     The Arizona Supreme Court discussed these circumstances when it denied
    Petitioner's claim that his right to be present and his right to counsel were violated when the
18  questionnaires were completed outside of his and counsel's presence:

19             Defendant could have remained.  The judge gave Defendant personal
         notice of the proceedings and told him he had a right to remain and that the
20        proceedings would continue if he left.  Thus, we reject the claim that
         Defendant was denied his right to be present during voir dire.  For the same
21        reasons, we reject Defendant's contention that he was denied his right to
         counsel when his attorney also left.
22             We similarly reject Defendant's claim that the trial court improperly
         communicated with the venire when the questionnaire was completed.  True,
23        it is improper for a trial judge to communicate with the venire unless the
         defendant and defense counsel have been notified and are given the
24        opportunity to be present.  As required . . . , however, both Defendant and his
         attorney were notified and given an opportunity to be present when the
25        questionnaires were completed.  A trial judge is not required to issue a writ to
         keep a defendant and defense counsel from voluntarily leaving a proceeding.
26        Nor does the record show any impropriety in the trial judge's responses to the
         questions raised after Defendant and defense counsel left the room.  Thus, we
         reject Defendant's claims.

27  *Bible*, 175 Ariz. at 571-72, 858 P.2d at 1174-75 (citations omitted).

28
                                    - 69 -

argument by citing the court's exchanges with two panel members. (Dkt. 29 at 27.) The first "unidentified prospective juror" asked Judge Mangum if he was a "hanging judge." (RT 2/27/98 at 28.) The question itself reveals nothing about the juror's attitude toward the death penalty, and the judge provided an appropriately thoughtful and scrupulous response. (*Id.*) The second prospective juror engaged the court in a somewhat extended dialogue, much of which concerned her nervousness, confusion, hearing difficulties, and troubles with her grandchildren. (*Id.* at 31-34.) The prospective juror also indicated that she was having difficulty with the question asking whether she could set aside what she had heard and judge the case fairly and impartially. (*Id.* at 33.) Responding to the juror's confusion, the judge attempted to clarify the issue by asking, "You'd be fair?" (*Id.*) She replied that she'd "try to be," and the judge responded, "Sure. That's what this [question] is talking about." (*Id.*) He then explained, summarizing the import of the question: "I would answer that question yes because you can be fair and impartial even though you have heard something about it." (*Id.*) Based upon this exchange, it is clear, contrary to Petitioner's assertion, that the judge's explanation did not modify the question so that it "no longer distinguished the biased jurors from the impartial ones." (Dkt. 29 at 27.) Moreover, it is apparent that the court intended to excuse this prospective juror based on her medical difficulties. The judge concluded his conversation with the juror by indicating, "But I wouldn't worry too much about these other questions because I think your hearing problem is so bad that probably you will be excused." (RT 2/27/90 at 34.)

Petitioner has not shown that his defense suffered in any way from counsel's decision not to remain with the venire panel while the questionnaire was filled out. Because the PCR court reasonably found that Petitioner was not prejudiced by counsel's performance, Petitioner is not entitled to relief on Claim 6.

### Claim 7:        Defense counsel performed ineffectively during jury selection.

Petitioner alleges that counsel performed ineffectively during voir dire by failing to ask the panel follow-up questions concerning their exposure to pretrial publicity and their

views on the death penalty.  (Dkt. 29 at 28-29.)  He also asserts that counsel should have asked additional questions of specific jurors.  (*Id.* at 29.)  The PCR court rejected this claim:

> Petitioner has not presented any claim that the jurors were other than fair and impartial.  Instead, he rests on speculation as to what information additional voir dire might have produced and concludes that the information would have been favorable to him.  There is no allegation that the actual jurors were biased, or disregarded the law and evidence and based their decision on some other factor.

(ME 11/24/97 at 2.)

Petitioner is not entitled to habeas relief because the PCR court correctly found that he did not suffer prejudice from counsel's performance during voir dire.[36]  When a claim of IAC is based on counsel's failure to strike a biased juror, the petitioner must show that the juror actually was biased.  *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001); *see Fields v. Brown*, 431 F.3d 1186, 1199 (9th Cir. 2005) ("immaterial" whether was counsel deficient in failing to pursue questioning of juror who was a rape victim because the juror was not biased and therefore the petitioner was not prejudiced by counsel's performance); *Wilson v. Henry*, 185 F.3d at 991 (no IAC where counsel relied on jurors' statements that they would be fair and follow the law without asking about their views on criminal history).  Petitioner has not made a showing that any of the jurors was biased or otherwise unqualified to serve or that additional questioning, assuming the court would have allowed it, would have revealed information leading to any juror's disqualification.  To the contrary, as noted above, each juror indicated that he or she could hear the case fairly and impartially.

---

[36]    Although this Court follows the PCR court and disposes of the claim on the basis that Petitioner has not shown prejudice, the Court also finds that Petitioner has failed to demonstrate that counsel performed deficiently during the jury selection process.  "The conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.'"  *Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) (quoting *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)).  The Court has previously discussed the factual background of this claim.  In assessing counsel's performance, the Court notes that in addition to drafting the entirety of the jury questionnaire, defense counsel filed a number of motions concerning jury selection, including an objection to death qualification of jurors (ROA 369), a motion for individual voir dire (ROA 371), and a request for additional peremptory strikes (ROA 415), all of which were denied.  (*See* ME 1/31/90, 2/6/90, 3/1/90.)  When viewed in this context, Petitioner has not shown that counsel's decision not to attempt to ask follow-up questions during the court's brief voir dire of the jury panel was unreasonable.

Claim 7 is therefore denied.

**Claim 9:        *Defense counsel performed ineffectively by failing to object to prosecutorial misconduct.***

Petitioner alleges that counsel was ineffective for failing to object to the instances of prosecutorial misconduct alleged in Claim 8.  (Dkt. 29 at 42.)

After reiterating that "[t]rial objections are a matter of strategy," the PCR court reviewed the allegations of prosecutorial misconduct – the comment about the "silly" questionnaire, the vouching for witnesses, references to the victim's rights, and the remark that the victim may have been tortured – and recounted the Arizona Supreme Court's decision that Petitioner's fair trial rights were not violated.  (11/24/97 at 4.)  The PCR court then concluded that Petitioner was not prejudiced by counsel's failure to object, explaining that "[t]here is no showing that any of the evidence admitted, or statements of the prosecutor, had they not been admitted or had they been stricken, prejudiced the Defendant in the sense that but for the admission there was a reasonable probability that the outcome would have been different."  (*Id.*)  This decision represented a reasonable application of *Strickland*.

As the PCR court noted, counsel's trial strategy with respect to objections is entitled to deference, and reviewing courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689. *See, e.g.*, *United States v. Mejia-Mesa*, 153 F.3d 925, 931 (9th Cir. 1998) ("While [a defendant] may argue that it may have been better to make a certain objection, a few missed objections alone, unless on a crucial point, do not rebut the strong presumption that counsel's actions (or failures to act) were pursuant to his litigation strategy and within the wide range of reasonable performance.").

For example, trial counsel may properly decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality."  *United States v. Molina,* 934 F.2d 1440, 1448 (9th Cir. 1991); *see Necoechea*,

986 F.2d at 1281 ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."); *Dubria v. Smith*, 224 F.3d 995, 1003-04 (9th Cir. 2000) (counsel's failure to object to closing argument in which prosecutor referred to defendant as "the biggest liar you've ever encountered" and defendant's story as a "piece of garbage" did not constitute deficient performance); *see also Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005) (failure to object to several aspects of prosecutor's conduct during his closing statement, including placement of victim's clothes from night of murder on rail of jury box, use of photographs of victim's body, references to matters not in evidence, emotional comment toward victim's mother, and remarks vouching for credibility of state's witnesses, was reasonable trial strategy and therefore not IAC).

In *Seehan v. Iowa*, 72 F.3d 607, 610-12 (8th Cir. 1995) (en banc), the Eighth Circuit considered a habeas petitioner's IAC claim based on counsel's failure to object to statements made by the prosecutor. The petitioner was charged with the murder of a two-year-old child. In her opening statement, the prosecutor, a visibly expectant mother, described the victim as "the kind of little boy that I would like to have. He was the kind of little boy you would like to have." *Id.* at 609. In his closing argument, another prosecutor stated that his duties included representation of the petitioner as "part of society," again described the victim, and told jurors that they were "part of the law enforcement chain." *Id.* The court of appeals held that defense counsel did not provide ineffective assistance in failing to object. The court found that all of the remarks, taken in context, were not so clearly improper as to demand objection, and that the petitioner also did not overcome the strong presumption that "the challenged action might be considered sound trial strategy." *Id.* at 611 (quoting *Strickland,* 466 U.S. at 689). The court also held that the petitioner had failed to show prejudice as a result of counsel's omissions because the state's case was strong and the primary issue at trial was whether the petitioner was sane when he took his child's life. *Id.* at 611-12.

Similarly, as the PCR court determined, defense counsel's failure to object to instances of alleged prosecutorial misconduct did not constitute IAC. Petitioner has not shown that counsel's silence was an unreasonable trial tactic and, given the strength of the case against him, he has not demonstrated that he was prejudiced by counsel's performance. In addition, as described above, the Arizona Supreme Court reviewed the instances of misconduct and determined that they did not deprive Petitioner of a fair trial, a further indication that Petitioner was not prejudiced by counsel's performance. Petitioner is not entitled to relief on Claim 9.

**Claim 11:** *Defense counsel performed ineffectively by failing to object to the testimony of the victim's father.*

Petitioner alleges that counsel's performance was ineffective with respect to the emotional testimony of the victim's father and of the law-enforcement witnesses who were with him when he removed his daughter's body from Sheep Hill.[37]  (Dkt. 29 at 47-48.)  The PCR court denied this claim on the same grounds used to reject the allegations in Claim 9. (ME 11/24/97 at 4-5.)   In doing so, the court reasonably applied *Strickland*.

Counsel's decision not to object to this testimony is entitled to deference as a matter of trial strategy. Petitioner's defense was alibi. According to the defense theory, he was elsewhere when the crime was committed and the physical evidence linking him to the scene was the product of a careless investigation. Nothing in this theory was compromised by counsel's failure to object to the witnesses' descriptions of the emotionally-charged events surrounding the discovery and removal of the victim's body; in fact, during his cross-examination of law-enforcement witnesses, counsel elicited testimony suggesting that the standard procedures for processing a crime scene were compromised due to the high level of emotion displayed by the participants. (*See, e.g.*, RT 3/7/90 at 161-63; RT 3/14/90 at 25-26.) Under these circumstances, it was reasonable for counsel not to risk alienating the jury

---

[37]      In an affidavit prepared during the PCR proceedings, Judge Mangum attested that he would have sustained objections to certain elements of this testimony as more prejudicial than probative.  (PCR petition, Ex. A.)

by objecting when the witnesses reacted emotionally during their testimony.  Consistent with this defense strategy, counsel also chose not to cross-examine Mr. Wilson, instead simply offering his condolences.  (RT 3/8/90 at 111-12.)  Likewise, during his opening statement and closing argument counsel expressed sympathy for the family, acknowledging the horrific nature of the crime and the immensity of their loss (RT 3/6/90 at 133; RT 4/11/90 at 112-13).  However, he also described Mr. Wilson's testimony as irrelevant and urged the jury to base its verdict on facts, not emotions.  (RT 4/11/90 at 111-12.)

Based upon these considerations, this Court concludes that the PCR court's application of *Strickland* to this claim was reasonable.  Claim 11 is therefore denied.

**Claim 13:       Defense counsel performed ineffectively with respect to the admission of the Rule 404(b) evidence.**

Petitioner alleges that he was prejudiced by counsel's "global failure" with respect to litigation of the prior bad act issue.  (Dkt. 29 at 58.)  The Court disagrees.

Background:

In 1981 Petitioner was convicted of the kidnapping and sexual assault of his seventeen-year-old cousin.  Prior to trial, Petitioner moved to preclude evidence of this prior bad act.  (ROA 16.)  The State moved to present the prior act under Arizona Rule of Evidence 404(b) as evidence of identity, motive, and intent and to show Petitioner's "emotional propensity" for engaging in sexual violence.  (ROA 23, 30.)  The court held a five-day evidentiary hearing to determine the evidence's admissibility.  (RT 5/3/89-5/5/89, 6/1/89-6/2/89.)  Mr. Phillips was new to the case at the time of the hearing and, according to his affidavit, unprepared to litigate the issue.  (PCR petition, Ex. B.)

At the hearing, evidence elicited from the victim and law enforcement witnesses indicated that the attack occurred on the afternoon of April 24, 1981, in a wooded area at the base of Sheep Hill.  Petitioner and the victim had been drinking vodka.  (RT 5/3/89 at 119.)  As they were leaving the area, Petitioner attacked the victim, pushing her to the ground.  (*Id.* at 125-26.)  He then bound the victim's hands and ankles, cut off her clothes with a knife,

- 75 -

1   penetrated her vaginally, forced her to perform oral sex, cut her on the face and neck, and

2   threatened to kill her.  (RT 5/3/89 at 31-47, 126-33.)  At one point Petitioner untied the

3   victim; he then bound her again as she straddled a tree.  (*Id.* at 37.)  Petitioner told the victim

4   that if she tried to get away he would kill her and hide her body where it would not be found

5   for days.  (*Id.* at 134-35.)  During the attack, Petitioner had two knives, a kitchen or butcher

6   knife and the victim's pocket knife.  (*Id.* at 121-22.)

7          The parties then presented evidence regarding emotional propensity.  Jeffrey Harrison,

8   a psychologist, testified for the State.  He opined that Petitioner "possess[ed] a continuing

9   propensity to commit sexually aberrant acts in the form of sexual violence against

10   individuals."  (RT 5/4/89 at 53.)  He based this opinion on several factors in addition to the

11   1981 rape and the murder of Jennifer Wilson: e.g., Petitioner's failure to complete sex

12   offender treatment in prison (*id.* at 46-47); Petitioner's statement while in treatment that he

13   "would never make that mistake again" in reference to leaving a living victim to report his

14   crimes (*id.* at 49); and evidence that Petitioner engaged in other inappropriate activities,

15   including a sexual relationship in 1987 with a fifteen- or sixteen-year-old girl (*id.* at 36, 45,

16   146).

17          The defense called Dr. Otto Bendheim, a psychiatrist, who testified that Petitioner did

18   not demonstrate an emotional propensity to molest Jennifer Wilson.  (RT 5/5/89 at 151-52.)

19   Dr. Bendheim expressed doubts that Petitioner was guilty of the 1981 rape (*id.* at 131-37),

20   challenged the veracity of the reports that Petitioner stated he would not leave his next victim

21   alive (*id.* at 108), and opined that there was nothing abnormal about Petitioner's recent

22   relationship with the teenage girl (*id.* at 117-18).  Dr. Bendheim further testified that he

23   found no evidence of a dysfunctional family background that would have affected

24   Petitioner's mental health.  (*Id.* at 78-79.)  Defense counsel also called for testimony from

25   Petitioner's father and sister, as well as a former girlfriend, who indicated that Petitioner's

26   family background was normal and that he did not behave violently or in a sexually

27   inappropriate manner.  (*See* RT 6/2/89 at 5-17, 101-15, 128-43.)

28

The trial court found evidence of the 1981 crime admissible to show identity but not to demonstrate emotional propensity.[38] (ME 8/8/89.) On direct appeal, the Arizona Supreme Court held that the prior act evidence was properly admitted:

> Although Defendant committed those offenses eight years before the victim's abduction, he served a seven-year sentence for the 1981 convictions.   The instant crime occurred approximately one year after Defendant's release from prison.  Thus, the prior offense was not too remote in time.
>
> The 1981 convictions and the 1988 abduction had numerous similarities, including:
>
>> * both incidents occurred in the Sheep Hill area;
>> * both incidents involved a vehicle;
>> * both victims were Caucasian female minors;
>> * both victims had their clothes removed;
>> * both victims had their hands tied behind their backs;
>> * both offenses occurred during daylight hours;
>> * evidence of vodka consumption in both incidents;  and
>> * evidence of the use of a knife in both incidents.
>
> Concededly, differences between the crimes do exist.  Defendant knew his 1981 victim, but apparently did not know the victim in this case.   In addition, the 1981 incident involved a seventeen-year-old victim, while the victim in this case was nine years old.   This difference, however, does not compel exclusion of the evidence.
>
> "Absolute identity in every detail cannot be expected.  Where an overwhelming number of significant similarities exist, the evidence of the prior act may be admitted."   The term "overwhelming" does not require a mechanical count of the similarities but, rather, a qualitative evaluation.  Are the two crimes so similar, unusual, and distinctive that the trial judge could reasonably find that they bear the same signature?  If so, the evidence may be admissible and any dissimilarities go to its weight.
>
> The evidence in this case shows enough of an arguable "signature" to find that the trial judge did not abuse his discretion in holding that the 1981 convictions were admissible to show identity under 404(b).  Nor do we believe that the evidence was so unfairly prejudicial that trial court abused its discretion under Ariz.R.Evid. 403.   Thus, we find no error in admitting evidence of Defendant's 1981 convictions.

*Bible*, 175 Ariz. at 575-76, 858 P.2d at 1178-79 (citations omitted).

Analysis:

---

[38]   At trial, the State presented evidence of the 1981 attack, primarily through the testimony of the victim, which was consistent with the account she offered at the evidentiary hearing.  (RT 3/28/90 at 180-210.)  At the close of trial, the court provided an appropriate limiting instruction with respect to the evidence.  (RT 4/11/90 at 185.)

1
2
3
4
5
6
7

In addressing this IAC claim, the PCR court noted Judge Mangum's opinion that defense counsel performed inadequately in their handling of the 404(b) issue. (ME 11/24/97 at 3.) Nevertheless, the PCR court found that Petitioner was not prejudiced by counsel's performance. (*Id.*) The Arizona Supreme Court had upheld the admissibility of the evidence, and the trial judge's affidavit "reveal[ed] nothing substantive from which one might conclude that the outcome of the trial would have been different." (*Id.*) In making this determination, the PCR court reasonably applied *Strickland*.

8
9
10
11
12
13
14
15
16

The Arizona Supreme Court ruled against Petitioner on the admissibility of the 404(b) evidence. *Bible*, 175 Ariz. at 576, 858 P.2d at 1179. Because the underlying issue was meritless, and the evidence was properly admitted, Petitioner cannot show that he was prejudiced by the manner in which counsel litigated the issue. *Morrison*, 477 U.S. at 375; *see Wilson*, 185 F.3d at 990 (counsel did not perform deficiently by failing to move for exclusion of defendant's prior bad acts because the evidence "was almost certainly admissible"). Moreover, any deficiencies in the handling of the prior victim's testimony at trial did not prejudice Petitioner given the overwhelming evidence linking him to the murder of Jennifer Wilson.

17

Petitioner is not entitled to relief on Claim 13.

18
19

**Claim 15:     *Defense counsel performed ineffectively by failing to prepare adequately  for trial.***

20
21
22

Petitioner alleges that counsel's lack of preparation led to ineffective performance in several areas. For the reasons discussed below, the Court finds that Petitioner is not entitled to relief on this claim.

23

*Focus on DNA*

24
25
26

Petitioner contends that counsels' "disproportionate" attention to the DNA evidence prevented the defense from challenging the remainder of the forensic evidence. (Dkt. 29 at 68.) This Court disagrees that the defense team's attention to the DNA evidence was

27
28

1   misplaced.[39]  The State offered the evidence, which definitively linked Petitioner to the

2   victim, and counsel was obligated to attempt to counter it.  Moreover, Petitioner has

3   presented nothing to suggest that the finding of the State's experts with respect to the

4   serological evidence, or the hair and fiber evidence, or the analysis performed on the metal

5   pieces from the vehicle's steering column, or the analysis performed on the cigar tobacco,

6   was in any manner susceptible to challenge had counsel undertaken a more diligent review

7   of the evidence.  *Cf. Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (habeas

8   petitioner "offered no evidence that an arson expert would have testified on his behalf at trial.

9   He merely speculates that such an expert could be found.  Such speculation, however, is

10  insufficient to establish prejudice.").  Counsel's performance in this area was not ineffective.

11                          *Dog-tracking evidence*

12          Petitioner next contends that counsel should have objected when a dog-handler

13  testified that he could not be certain whether his dog Bo, who was enlisted to search for

14  Petitioner after the high speed chase, reacted to the victim's scent or to Petitioner's when he

15  entered Petitioner's vehicle.  (Dkt. 29 at 69-71.)  The PCR court, citing the Arizona Supreme

16  Court's determination that there was no error in the admission of the dog-tracking testimony,

17  *Bible*, 175 Ariz. at 597, 858 P.2d at 1200, and noting that another witness offered

18  inconsistent testimony about the dog's behavior, a fact which "could have affected the

19  credibility of either the Sheriff or the dog handler if left standing," found that counsel made

20  "a tactical choice not to object." (ME 11/24/97 at 4.)

21          This Court agrees that counsel's performance here was not deficient.  First, counsel

22  did object on foundational grounds when the prosecutor asked the witness if he could "tell

23  the jury for sure whether Bo was looking for Jennifer Wilson or Richard Bible when he went

24  out into the woods."  (RT 3/9/90 at 45.)  The court overruled the objection, and the witness

25

26          [39]      Elsewhere, Petitioner alleges that counsel was inadequately prepared to
    challenge the State's DNA evidence.  (Dkt. 29 at 82-83.)  This argument is moot because,
27  as already noted, Petitioner's conviction was upheld after the DNA evidence was excluded.
    *Bible*, 175 Ariz. at 589, 858 P.2d at 1192.

28

1    answered that he was not sure who Bo was "working" at that time. (*Id.* at 45-46.) In

2    addition, defense counsel thoroughly and skillfully cross-examined the witness about the

3    limitations of a tracking dog's abilities and of the inferences that could be drawn from its

4    "body language." (*Id.* at 46-60.) Counsel reiterated this critique of "the wonder dog, Bo,"

5    during his closing argument. (RT 4/11/90 at 121-23.)

6        Also unfounded is Petitioner's complaint that counsel neglected to inform the jury that

7    prior to June 25 dogs had searched Sheep Hill and failed to locate Jennifer Wilson's body.

8    In fact, counsel made precisely that point during his cross-examination of Sheriff Richards

9    (RT 3/9/90 at 203-10) and repeated it in his closing argument (4/11/90 at 122-23).

10        *Foundation of evidence taken from Petitioner's clothing*

11        Petitioner next contends that counsel's performance was ineffective because he failed

12    to challenge the chain of custody with respect to Petitioner's clothing, principally the blood-

13    stained shirt. (Dkt. 29 at 71-73.) At a pretrial evidentiary hearing, Deputy Nielson testified

14    that on June 6, 1988, he performed a strip search of Petitioner and placed his belongings in

15    a paper bag provided to him by Det. Trimble. (RT 1/27/89 at 5-6.) He then turned the bag

16    over to Det. Trimble. (*Id.* at 8.) After taking possession of the bag, Det. Trimble separated

17    the items of Petitioner's clothing and transferred them to other paper bags. (*Id.* at 15.) He

18    placed the bags under his desk (*id.*), where they remained until June 10, when he moved them

19    to the evidence locker (*id.* at 19-20). At that point, the evidence custodian took possession

20    of the items (*id.* at 30), until they were checked out for analysis by personnel from the crime

21    lab (*id.* at 31-32).

22        Petitioner contends that defense counsel should have filed a motion in limine

23    challenging the chain of custody of this evidence or objected to its admissibility on

24    foundational grounds. (Dkt. 29 at 73.) This Court disagrees. As noted above, failure to raise

25    a meritless motion does not constitute IAC. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.

26    1996) ("the failure to take a futile action can never be deficient performance"); *James v.*

27    *Borg*, 24 F.3d 20, 27 (9th Cir. 1990) ("failure to make a futile motion does not constitute

28

- 80 -

ineffective assistance of counsel"). Because the State presented evidence showing "continuity of possession," it properly established the chain of custody of Petitioner's clothing. *State v. Spears*, 184 Ariz. 277, 287, 908 P.2d 1062, 1072 (1996) (state not required to "disprove every remote possibility of tampering"). While it would have been futile to move to exclude the evidence on foundational grounds, in his cross-examination of Det. Trimble at trial defense counsel did in fact challenge the handling of Petitioner's clothing. (RT 3/13/90 at 193-97.)

*Inadequate preparation for testimony of State's witnesses*

Petitioner asserts that counsel's lack of preparation resulted in ineffective performance with respect to his examination of witnesses. First, Petitioner faults counsel's handling of the testimony of Robert Emerick, the prison counselor who recounted Petitioner's statement, in relation to his prior offense, that he regretted leaving a witness behind. (RT 3/27/90 at 136.) Petitioner is correct that counsel managed to elicit further damaging testimony during his brief cross-examination of Mr. Emerick. (*Id.* at 137-69.) Based upon Mr. Emerick's responses, the preferable strategy would have been for counsel not to engage the witness at all. This Court finds, however, having eschewed "the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, that it was not unreasonable for counsel to attempt to limit the damage from the witness's direct testimony, which concluded with the damning statement that "[t]he only remorse that Rick ever conveyed was that he had been caught and that there was somebody who was left behind to report him." (RT 3/27/90 at 136.) That counsel's trial tactic proved to be unsuccessful does not establish that his performance was ineffective. *See Strickland*, 466 U.S. at 689 (cautioning that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable").

Next, Petitioner contends that counsel performed ineffectively by failing to object when Dr. Vorpahl, the medical examiner, testified that the fact that the victim was found completely naked with her hands bound were "findings indicative of some type of sexual

molestation, which, of course, would lead one to suspect or to do a careful examination of the genital region." (RT 3/29/90 at 154-55.) While Petitioner characterizes this testimony as "improper opinion evidence" (Dkt. 29 at 77), in fact it was a response to the prosecutor's inquiry as to why Dr. Vorpahl examined the victim's genital region, which was badly decomposed and contained no evidence of semen. (RT 3/29/90 at 154.) Because the testimony was arguably not objectionable, counsel's silence did not constitute deficient performance.[40] In addition, as the PCR court found, Petitioner was not prejudiced by counsel's failure to object. (ME 11/24/97 at 4.) The court explained, quoting *Bible*, 175 Ariz. at 596, 858 P.2d at 1199, that Dr. Vorpahl's testimony "states the common sense conclusion." (*Id.*) The PCR court further noted that Petitioner's claim "fails to analyze the impact of this evidence in light of all the other evidence relevant to the molestation issue." (*Id.*)

Next, Petitioner argues that counsel should have objected when Det. Trimble testified that at one point after Petitioner's arrest he observed that Petitioner "was on the right side of the patrol car in the back seat leaning over in the seat, couldn't be seen." (RT 3/13/90 at 162.) At that time there was present at the scene a white pickup truck resembling one of the Wilsons' vehicles. (*Id.* at 163-64.) Later, according to Det. Trimble's testimony, Petitioner asked him who was in the white truck. (*Id.* at 191-92.) The implication of this testimony – that Petitioner was hiding from view because he thought the Wilsons were present – is far clearer in hindsight than it would have been to the jury at the time; in that sense, counsel performed reasonably in not calling further attention to the testimony. When the prosecutor made the implication explicit in his closing argument (RT 4/11/90 at 39-41), defense counsel countered with precisely the explanation Petitioner now faults him for not advancing – i.e., that Petitioner was not hiding from the Wilsons but was simply trying to avoid having his

---

[40]     Counsel did object, successfully, to the prosecutor's next question about the "examination of the genital region," on the ground that it had been asked and answered. (RT 3/29/90 at 155.)

- 82 -

picture taken by the media (*id.* at 120).  Moreover, whether or not counsel should have objected – and whether the court would have sustained such an objection[41] – Petitioner was not prejudiced by counsel's performance: the incident was not the focus of Det. Trimble's testimony and its significance to the State's case was *de minimis*.

Petitioner also claims that counsel mishandled the testimony of a boy named Chris Harris and his mother, Kim Goings, neighbors of Wesley Bible whose testimony was crucial to establishing the State's time-line.  In his testimony, Chris described his encounter with Petitioner on the afternoon of June 6.  Prompted by the prosecutor, he testified that Petitioner was "not nice" to him when they met.  (RT 3/9/90 at 134.)  When Chris called his mother to report Petitioner's presence, he told her that his brother was scared.  (*Id.* at 135.)  She told him to stay inside and lock the door while she called the police.  (*Id.* at 136.)

Counsel's failure to object to this testimony did not constitute deficient performance.  The boy's testimony was relevant to show Petitioner's demeanor in the interval between Jennifer Wilson's abduction and Petitioner's capture, so an objection was likely to be futile.  In addition, during his cross-examination of Chris Harris, counsel, while focusing on the time frame established by the boy's testimony, also elicited testimony that while Petitioner was "abrupt" with the boy, he did not threaten him; Chris also acknowledged that he did not see any blood on Petitioner.  (*Id.* at 143, 151.)

Ms. Goings testified that after receiving the call from her son, she spoke on the phone with Petitioner's mother.  (*Id.* at 159.)  During their conversation, Mrs. Bible stated that she would call the sheriff.  (*Id.* at 161.)  Ms. Goings testified that she asked Mrs. Bible if she thought Petitioner would hurt her children and Mrs. Bible replied, "at this point, I don't know."  (*Id.*)  Counsel did not object to this testimony.  On cross-examination, he again focused on the time-line established by Ms. Goings's account.  (*Id.* at 162-65.)

---

[41]     In his affidavit, Judge Mangum states that he would have sustained an objection "to the testimony of Billy Trimble that the defendant recognized the Wilson family truck." (PCR petition, Ex. A.)  There was no such testimony.

While elements of Ms. Goings's testimony might have been improper, and Judge Mangum would have sustained an objection to the testimony that Mrs. Bible did not know if her son was a danger to Ms. Goings's children (PCR petition, Ex. A), it is not necessary for this Court to determine whether defense counsel's failure to object was the product of incompetence or a reasonable trial strategy. As the PCR court properly found, the admission of the testimony without objection did not prejudice Petitioner. (ME 11/24/97 at 5.) The testimony was wholly unrelated to the overwhelming physical evidence tying Petitioner to the crime.

*Conclusion*

The PCR court considered all of Petitioner's IAC claims based on counsel's alleged deficiencies and determined that Petitioner was not prejudiced:

> When[,] however, these objections, assuming they would have been sustained, are viewed in the light of the overwhelming evidence of guilt heard by the jury, it is difficult to conclude that any one bit of evidence, or viewing the evidence cumulatively, would have probably changed the jury's verdict.

(ME 11/24/97 at 5.)

Having reviewed each of Petitioner's allegations that trial counsel's inadequate preparation led to constitutionally ineffective assistance of counsel, this Court concludes that the PCR court reasonably applied *Strickland* in rejecting the claim. Petitioner has not established, with respect to any aspect of counsel's handling of witnesses or evidence, that counsel's performance was both deficient and prejudicial. Therefore, Petitioner is not entitled to relief on Claim 15.

**Claim 16:    Defense counsel performed ineffectively by failing to adequately investigate and present available exculpatory evidence.**

Petitioner alleges that counsel failed to present exculpatory evidence in the form of alternative suspects,[42] sightings of the victim post-dating the day of her abduction, and other

---

[42]    Petitioner cites Timmy Gremmels as the leading alternative-suspect candidate. (Dkt. 29 at 78-79.) However, when cataloguing Gremmels's qualifications for the position (*id.*), Petitioner provides no citation to the record, which does not appear to contain any

1    evidence suggesting that the child's body was placed on Sheep Hill after Petitioner's arrest.

2    (Dkt. 29 at 85-89.)

3        The PCR court rejected these allegations, finding that Petitioner was not prejudiced

4    by counsel's performance:

5            Petitioner claims that defense counsel did not adequately investigate or
         present evidence which was available to him and which would have exculpated
6            Petitioner. This evidence would have suggested to the jury that the victim was
         seen alive after Petitioner was taken into custody, that another car other than
7            the GMC Jimmy was seen on Sheep Hill on June 6, that an extensive ground
         and air search of Sheep Hill failed to reveal evidence which should have been
8            found before June 25th, and that there was certain evidence that pointed to
         Timmy Gremmels as the murderer. This alleged exculpatory evidence is
9            strongly countered by overwhelming evidence of the Petitioner's guilt.
                                    . . .

10           Petitioner alleges newly discovered evidence. An affidavit from the
11       single witness of her potential testimony was not submitted. There are not
         facts alleged from which the Court can infer due diligence. The admissible
12       statements and the manner presented would not, in light of all the evidence
         presented at trial, have changed the verdict. A colorable claim is not
13       presented.

14   (ME 11/24/97 at 5.)

15       The PCR court's decision constitutes a reasonable application of *Strickland*. To credit

16   this "exculpatory" information, the jury would have to discount all of the evidence linking

17   Petitioner to the crime, including, for example, the items from Petitioner's vehicle – the

18   miniature vodka bottles, the rubber bands, the cigar, the cocoa packs, the metal pieces from

19   the steering column – which were found with the victim's body on top of Sheep Hill. To be

20   swayed by the hypothesis that another murderer was involved, the jury would have had to

21   find credible the proposition that on June 5 or the morning of June 6, the day of Jennifer

22   Wilson's abduction, Petitioner traveled to the top of Sheep Hill to scatter items from the

23

24   _____

25   information about Gremmels, beyond that recounted in a handful of newspaper articles, one
     of which indicates that he was in an alcohol-rehabilitation center in Tucson on the day of
26   Jennifer Wilson's abduction. (ROA 174ii.) Even if the unsupported assertions contained in
     the petition were true, they fall short of showing that Gremmels had motive and opportunity
27   as required under Arizona law for the admissibility of evidence of third-party culpability.
     *See State v. Prion*, 203 Ariz. 157, 161 ¶¶ 19-24, 52 P.3d 189, 193 (2002).
28

vehicle he just stole and then, sometime during the next week,[43] the real culprit brought the girl to the same location, bludgeoned her to death, and placed her body among the debris. Whatever plausibility jurors might have attributed to this scenario would have been severely compromised by the hair, fiber, and blood evidence linking the victim directly to Petitioner. Because Petitioner was not prejudiced by counsel's failure to present exculpatory evidence, he is not entitled to relief on Claim 16.

### Claim 20:   Defense counsel performed ineffectively at the sentencing stage of trial.

Petitioner alleges that counsel failed to prepare adequately for the sentencing stage of trial. (Dkt. 29 at 95-100.)  Principally, Petitioner contends that counsel did not begin his mitigation investigation in a timely manner and did not provide proper guidance to his mental-health expert or his investigator.  As a consequence, according to Petitioner, counsel was unable to present a full and coherent case in mitigation.

Background:

Petitioner was convicted on April 12, 1990.  Defense counsel moved for a Rule 26.5[44] diagnostic evaluation and a date for the sentencing hearing "set for at least the 60 days we are entitled to by the rules."  (RT 4/12/90 at 31.)  Subsequently, defense counsel stipulated to the sixty-day deadline and the sentencing hearing was set for June 12, 1990.  (ROA 538.) On April 25, counsel moved for the appointment of Dr. Otto Bendheim, who had served as Petitioner's expert during the emotional propensity hearing; the court appointed Dr. Bendheim as an expert under Rule 26.5.  (ROA 540.)  The court also appointed Dr. Jeffrey Harrison to perform a Rule 26.5 evaluation.  (ROA 541.)  The court directed Drs. Bendheim

---

[43]     The medical examiner testified that the state of the body was consistent with it having been present at the location where it was discovered for nineteen days. (RT 3/29/90 at 143.)  He further testified that Jennifer Wilson had been dead for two to four weeks suggesting that her body had been on Sheep Hill since at least June 11. (*Id.* at 173)

[44]     Arizona Rule of Criminal procedure 26.5 provides that prior to sentencing courts may order a defendant to "undergo a mental health examination or diagnostic evaluation."

1   and Harrison to evaluate Petitioner's "mental condition . . . at the time he committed the

2   offenses" and the "relation" of any "mental disease or defect" to the offenses, and to

3   determine whether Petitioner's "capacity to appreciate the wrongfulness of his conduct or to

4   conform his conduct to the requirements of the law was significantly impaired, but not so

5   impaired as to constitute a defense to prosecution" – i.e., to assess the applicability of the

6   mitigating factor set forth in A.R.S. § 13-703(G)(1). (ROA 540, 541.) The court also sought

7   the experts' opinions on Petitioner's potential for rehabilitation and his feelings of remorse.

8   (*Id.*)

9        Dr. Bendheim filed his report on May 25. (ROA 546.)  His findings were favorable

10  to Petitioner and supported the mitigating circumstances advanced by defense counsel.  Dr.

11  Bendheim found that Petitioner, while not legally insane, did suffer from diminished capacity

12  at the time of the crimes as a result of the withdrawal symptoms he experienced following

13  a year-long drug and alcohol binge:

> [U]nder the circumstances described above, a person who consumes these
> substances, particularly large amounts of amphetamines and large amounts of
> Cocaine[,] both central nervous stimulants, presents severe curtailment of
> judgment, hypervigilance, suspiciousness and, in many instances,
> aggressiveness and even violence. It is my opinion that this defendant must
> have been of "diminished capacity" at that time, with not only curtailment of
> proper judgment but also perhaps an inability to resist impulses.

18  (ROA 546c.) Dr. Bendheim also theorized that Petitioner's inability to control his impulses

19  might have "been of a sexual nature" and that Petitioner's substance abuse problems might

20  have a genetic component. (*Id.* at 546c-546d.)

21       Dr. Bendheim further opined: "In the absence of serious and prolonged voluntary

22  consumption of very dangerous drugs and alcohol and in the absence of the withdrawal

23  symptoms . . . it is my belief that these offenses, more than likely would not have taken

24  place." (*Id.* at 546d.)  Finally, Dr. Bendheim found that Petitioner's "prolonged drug

25  addiction, the resultant rather severe withdrawal symptoms, his general personality and

26  character traits, made it more difficult for [him] to live within the requirements of the law."

27  (*Id.* at 546e.)

28

1   Dr. Harrison, in his eleven-page report filed June 4, concluded that Petitioner "does
2   not present any mental illness or mental disorder requiring treatment" but that he does
3   "present a very serious characterological disturbance in the form of Antisocial Personality
4   Disorder." (ROA 555i.)  Dr. Harrison also opined that "the defendant did not suffer from any
5   mental disease or defect at the time of the offenses with the exception of possible drug
6   addiction."  (ROA 555j.)  According to Dr. Harrison, Petitioner's drug addiction, while not
7   a "causative factor," "may have exacerbated underlying conditions of sexual deviancy and
8   aggression as well as disinhibiting internal controls."  (*Id.*)  Dr. Harrison also found that
9   Petitioner "clearly understood the wrongfulness of the action at the time of the crime." (*Id.*)

10  On June 7, 1990, defense counsel filed a twenty-two-page sentencing memorandum
11  arguing one statutory mitigating factor – that Petitioner's ability to appreciate the
12  wrongfulness of his conduct or to conform his conduct to the requirements of the law was
13  substantially impaired pursuant to § 13-703(G)(1) – and several nonstatutory mitigating
14  circumstances, including a difficult family history, feelings of remorse, and a low risk of
15  future criminal conduct.  (ROA 563.)  Counsel also argued that a proportionality review
16  would indicate that the death sentence was not appropriate for Petitioner's crimes.  (*Id.*)
17  Finally, counsel pleaded for mercy.  (*Id.*)  Attached to the motion were Dr. Bendheim's
18  report (*id.*, Ex. B) and a preliminary Rule 11 evaluation, prepared in March 1989 by Dr. Dean
19  Gerstenberger, which detailed Petitioner's self-reported history of serious drug abuse but
20  concluded that there was "no evidence of any mental illness or thought disorder" (*id.*, Ex. A).

21  On June 8, 1990, four days before the date of the sentencing hearing, counsel filed a
22  motion to continue the sentencing hearing, arguing that additional time was necessary to
23  investigate Petitioner's diminished capacity due to alcohol addiction and withdrawal and
24  evidence of possible childhood illnesses and injuries; counsel attached an affidavit from
25  Petitioner's mother stating that Petitioner had a difficult birth and that as a child he exhibited
26  hyperactivity, which was treated with dextro-amphetamines, frequently had high fevers,
27  suffered from allergies, and experienced ringing in his ears.  (ROA 565.)  Mrs. Bible also

28

indicated that she had not yet provided Petitioner's medical records to counsel. (*Id.*) The defense investigator, Ms. Lawson, attested that counsel had some but not all of Petitioner's medical records. (*Id.*) Also on June 8, counsel filed a motion seeking the appointment of a psychiatrist, a neuropsychiatrist or neurologist, and a toxicologist. (ROA 575, 576.) With respect to information concerning Petitioner's childhood medical problems, defense counsel Phillips and Koopman explained to the court that they had spoken with Petitioner on three separate occasions for three hours each and "gone over his complete medical history." (RT 6/11/90 at 11.) Petitioner told counsel he had never been hospitalized and "never had medical type problems that [counsel] were concerned about." (*Id.*) Counsel then explained that until a few days ago "Mrs. Bible . . . continually told us that [Petitioner] didn't have any of these medical problems." (*Id.*) Despite counsels' explanations, the trial court found that "the defendant has failed to use due diligence in preparing for the sentencing hearing" and denied both the motion to continue and the motion for the appointment of experts. (*Id.* at 12.)

*Sentencing hearing*

The sentencing hearing took place on June 12-14, 1990. In presenting Petitioner's case, defense counsel[45] called a total of fifteen witnesses, who offered extensive and wide-ranging mitigation testimony.

Defense counsel called Petitioner's family members as mitigation witnesses, including Petitioner's mother, father, sisters, brother, and grandmother.[46] Their testimony indicated that the Bible family was close, that no abuse occurred during Petitioner's childhood, that Petitioner was an affectionate youth, that his behavior around children was always appropriate, and that he had a normal relationship with a woman named Josephine Sandoval and her young son after Petitioner was released from prison in 1987. Many of the witnesses

---

[45]     Mr. Phillips was assigned responsibility for the sentencing hearing.

[46]     Many of these witnesses, including Petitioner's father, sister, and former girlfriend, had also testified on Petitioner's behalf at the emotional propensity hearing.

1   also indicated that Petitioner's positive qualities were affected by his drug abuse.  All of the

2   witnesses expressed skepticism about Petitioner's guilt and asked the judge not to impose the

3   death penalty.

4        Mrs. Bible testified that she was pregnant with Petitioner for ten months; after a

5   difficult delivery, the baby required oxygen.  (RT 4/12/90 at 30-31.)  As a child, Petitioner

6   was frequently ill, suffering from fevers and allergies, which on occasion required

7   hospitalization and medication, some of which was taken intravenously.  (*Id.* at 31-33.)

8   According to Mrs. Bible, Petitioner was also hyperactive – a condition for which he was

9   prescribed amphetamines – had difficulty concentrating, and was a poor student.  (*Id.* at 35-

10  36.)  He complained of ringing ears and headaches; however, he was never seen by a

11  neurologist or subjected to a brain scan.  (*Id.* at 36-37.)  When Petitioner was around ten,

12  Mrs. Bible caught him sniffing glue with some other children.  (*Id.* at 40-41.)  He received

13  juvenile counseling at age twelve or thirteen, but no psychological treatment.  (*Id.* at 39.)

14       Mrs. Bible testified that Petitioner interacted "fine" with his siblings and with other

15  children.  (*Id.* at 42.)  The family went on camping and fishing trips together.  (*Id.* at 47.)

16  According to Mrs. Bible, Petitioner was "never abused" but was disciplined with a belt.  (*Id.*

17  at 42, 44.)  Petitioner was an affectionate, thoughtful child, and he and his mother had a good

18  relationship.  (*Id.* at 41-42.)

19        Mrs. Bible testified that Petitioner was very popular with girls, although he was shy

20  around them.  (*Id.* at 51-52.)  He also excelled at sports, and won a variety of awards for

21  athletics.  (*Id.* at 48-51.)  She acknowledged that in junior high or high school Petitioner got

22  into a couple of fights, once while protecting his sister.  (*Id.* at 44.)  He experienced other

23  legal problems as an adolescent (*id.* at 45-46), and eventually dropped out of school (*id.* at

24  52).

25       Mrs. Bible testified that the family remained close even after Petitioner went to prison

26  in 1981.  (*Id.* at 54.)  He frequently sent her cards and letters, which often featured his

27  drawings; he was a talented artist.  (*Id.* at 58-61, 68-69.)  While in prison, he received

28

positive reports from a teacher and a work supervisor.  (*Id.* at 56-57.)  He got into fights in prison, but only to protect himself.  (*Id.* at 55.)  Mrs. Bible testified that Petitioner enjoyed a normal relationship with Jo Sandoval; they lived together for a time, and he provided for her and her child; he loved the baby and the baby loved him.  (*Id.* at 74-75, 87.)

According to Mrs. Bible, Petitioner sought counseling after he was released from prison, but he had to stop the sessions because he could no longer afford them.  (*Id.* at 86-87.) Mrs. Bible testified that she would continue to love and support Petitioner even after his conviction.  (*Id.* at 85.)  She begged the judge to spare his life.  (*Id.* at 90.)

Counsel presented similar testimony from other family members.  Petitioner's father testified that he frequently took his sons hunting and fishing, that Petitioner loved those activities but that he was never cruel to animals, never displayed violence or aggression, and never used a firearm inappropriately.  (*Id.* at 96-99.)  Mr. Bible closely followed his son's sporting activities, attending every game.  (*Id.* at 102.)  Mr. Bible testified that Petitioner loved Joey, Ms. Sandoval's child.  (*Id.* at 104.)  Petitioner also loved his nieces; he never disciplined or lost his temper with them, and they all loved him.  (*Id.* at 104-05.)  In Mr. Bible's observation, his son's relationships with women were normal.  (*Id.* at 107.)  Mr. Bible testified that if his son was guilty of the crimes for which he was being sentenced, the only explanation for his behavior could be drug use.  (*Id.* at 98, 109.)

Petitioner's younger sister Dina Ward recalled that she was close to her brother and that he was protective of her.  (*Id.* at 119.)  She testified that he was always appropriate around her children, that he liked children and was a very caring person.  (*Id.* at 123-25.) According to Ms. Ward, before he went to prison Petitioner used drugs and alcohol on weekends (*id.* at 120); after his release, he began to use drugs, including crystal, more heavily (*id*. at 123).  Shortly before his arrest in June 1988, Petitioner was under great emotional stress and told Dina that he felt like he was having a nervous breakdown.  (*Id.* at 125.)

Petitioner's grandmother testified that she and Petitioner were very close.  (*Id.* at 139.) She also testified that Petitioner was kind and affectionate to Ms. Sandoval and her boy; he

1   was distraught when the relationship ended.  (*Id.* at 139-43.)

2          Defendant's brother, Wesley, also testified that their family was close growing up, that

3   they enjoyed camping trips together, and that Petitioner was never cruel or violent.  (RT

4   6/13/90 at 3-4.)   He stated that Petitioner was quiet and shy around girls and that his

5   relationships with girls were normal.  (*Id.* at 5.)  From Wesley Bible's observations, the

6   relationship between Petitioner, Ms. Sandoval, and her child was appropriate (*Id.* at 8-9.)

7          Counsel also presented the testimony of Ms. Sandoval.  She explained that she was

8   involved with Petitioner during most of the period between his release from prison and his

9   arrest.  (RT 6/13/90 at 83.)  Petitioner was loving and sexually appropriate, normal, and

10  affectionate.  (*Id.* at 88.)  He took care of her and Joey; he wanted to do everything for the

11  child and to be the child's dad.  (*Id.* at 85.)  Ms. Sandoval acknowledged that Petitioner had

12  physically abused her on one occasion, giving her a black eye; afterwards he cried and

13  apologized; he never struck her again.  (*Id.* at 86-87.)  Ms. Sandoval testified that Petitioner

14  drew pictures and wrote poetry for her.  (*Id.* at 88-89.)

15         Ms. Sandoval then described Petitioner's drug use, indicating that he snorted cocaine

16  and crystal, and might have used drugs intravenously.  (*Id.* at 90-91.)  According to Ms.

17  Sandoval, when Petitioner was using drugs he was unpredictable, but when he wasn't using,

18  he was "pretty nice."  (*Id.* at 91.)  Ms. Sandoval testified that Petitioner was under a lot of

19  stress when their relationship ended and he was no longer allowed to see her and her child.

20  (RT 6/14/90 at 3-4.)

21         Counsel also presented the testimony of several of Petitioner's friends, who described

22  Petitioner's drug use but stated that they never observed him behave in a sexually

23  inappropriate manner and that they trusted him to look after their children.  (*See* RT 6/13/90

24  at 150-51.)  A longtime friend named Rudy Lozano described Petitioner as sensitive and

25  truthful (*id.* at 155); Lozano's sister described Petitioner as thoughtful and "real sweet" (*id.*

26  at 160).  Another girlfriend, Tammy Zeller, testified that during their relationship Petitioner

27  was a "perfect gentleman"; he was shy, never violent or aggressive.  (*Id.* at 169-70.)

28

1       The defense investigator, Ms. Lawson, testified that she had been involved with the
2   case for eight or nine months and had gotten to know Petitioner "pretty well."  (RT 6/13/90
3   at 24.)  Ms. Lawson found Petitioner to be "socially appropriate, very pleasant" (*id.* at 28),
4   as well as cooperative, honest, sensitive, remorseful toward the Wilson family, and
5   frightened about his own future (*id.* at 26-31).  Petitioner acknowledged to Ms. Lawson that
6   he was an addict and that without drugs he would not be in the position he was in.  (*Id.* at 29.)
7   Ms. Lawson testified that Petitioner loved his family, that they had remained supportive, and
8   that he expressed regret for the position he had put them in.  (*Id.* at 30-31.)  Ms. Lawson also
9   testified that while in jail Petitioner had foiled an escape attempt because he feared a guard
10  would be injured.  (*Id.* at 17-22.)

11      Defense counsel presented extensive testimony from Dr. Bendheim.  Dr. Bendheim
12  testified that he had examined Petitioner twice, reviewed Petitioner's family history and
13  record of drug and alcohol abuse, and reviewed the reports of Drs. Gerstenberger and
14  Harrison.  (*Id.* at 45, 49, 51.)  Dr. Bendheim described Petitioner as "polite, courteous,
15  cooperative" during their encounters.  (*Id.* at 51.)

16      Dr. Bendheim testified that although Petitioner had a "good home, good parents" (*id.*
17  at 46), he began using alcohol and a wide variety of drugs at the age of fourteen (*id.* at 46-
18  47).  His drug use continued even while he was in prison.  (*Id.* at 46-47, 50.)  Cocaine and
19  amphetamines became his drugs of choice, and he began using drugs intravenously in 1981.
20  (*Id.* at 50).  Petitioner used drugs on an almost daily basis in the year prior to the murder.  (*Id.*
21  at 48.)

22      Under counsel's direction, Dr. Bendheim proceeded to discuss the effects of drug
23  abuse and withdrawal.  He testified that prolonged abuse, especially of amphetamines, causes
24  organic changes to the brain.  (*Id.* at 53, 56.)  When the drug is withdrawn, the user's
25  "capacity to conduct himself properly and decently is again diminished."  (*Id.*)  Dr.
26  Bendheim testified that in his opinion, at the time of the crime Petitioner was in a such state
27  of diminished capacity because he was suffering the effects of withdrawal.  (*Id.* at 53-55.)

28

- 93 -

He further agreed that in a state of intoxication or withdrawal, Petitioner would have had difficulty conforming his conduct to the requirements of the law. (*Id.* at 54.) Dr. Bendheim added that chronic abuse of, and withdrawal from, amphetamine and cocaine can lead to acute psychoses. (*Id.* at 56.)

Dr. Bendheim explained that organic brain changes due to chronic drug use could be detected by brain scans, but that no such tests had been performed on Petitioner. (*Id.* at 57-58.) Dr. Bendheim testified that he had attempted to contact other experts in the fields of addiction and toxicology (*id.* at 58-60); he indicated that additional testing by experts in "withdrawal symptomatology and detoxification" would "possibly" reveal additional information concerning Petitioner's "mental impairment" or the effects of his drug use (*id.* at 61). Counsel also discussed with Dr. Bendheim the ruling in *State v. Rossi*,[47] where the Arizona Supreme Court found, based on expert testimony at trial, that the defendant's cocaine addiction constituted a mitigating factor because it overwhelmed his ability to conform his conduct to the requirements of the law. (*Id.* at 61-62.)

Finally, Dr. Bendheim reiterated the opinion contained in his report that absent the effects of drugs and alcohol Petitioner would not have committed the crimes. (*Id.* at 64-65.) On cross-examination, however, he also repeated his opinion that Petitioner's character traits and personality also contributed to the crime. (*Id.* at 76.)

At the conclusion of Petitioner's case, the State called one rebuttal witness, Det. Mike Rice, who had interviewed Petitioner on the day of his arrest.[48] (RT 6/14/90 at 20.) Det. Rice testified that Petitioner did not seem to be impaired during their interview and exhibited no signs of intoxication or withdrawal. (*Id.* at 20-21, 24.) Petitioner did not have the

---

[47]     *State v. Rossi*, 154 Ariz. 245, 250, 741 P.2d 1223, 1228 (1987).

[48]     In support of the aggravating circumstances alleged by the State, the prosecutor called a fingerprint expert who linked Petitioner with the prior conviction (RT 6/12/90 at 5-9) and the medical examiner, Dr. Vorpahl, who testified in support of the especially cruel aggravating factor (*id.* at 9-16).

"shakes"; he did not appear to be chilled or sweating; he did not request food or water; he had no medical complaints. (*Id.*) His memory was sharp and intact; he spoke and answered questions coherently; and he was able to draw accurate, detailed maps depicting his whereabouts on June 5 and 6. (*Id.* at 23.) Petitioner told Det. Rice that it had been four or five days since he had used drugs. (*Id.* at 26.)

At the close of testimony, defense counsel offered a lengthy, comprehensive, and impassioned closing argument. (*Id.* at 60-114.) Much of the argument focused on Petitioner's impairment at the time of the crime. (*Id.* at 91-109.) Counsel recounted Petitioner's chronic drug abuse, arguing that it entered an increasingly acute stage after his release from prison and in the period immediately prior to the murder, when it was exacerbated by other factors, including the termination of his relationship with Ms. Sandoval and his status as a fugitive avoiding arrest for a series of burglaries. (*Id.*) Counsel also described Petitioner's positive qualities, including his love for his family and his feelings of remorse. (*Id.* at 91, 111.) Counsel urged the court not to be influenced by the public sentiment against Petitioner. (*Id.* at 108-10.) At the end of his argument, counsel pleaded for mercy. (*Id.* at 114.)

*Special verdict*

In sentencing Petitioner on the murder conviction, the trial court found three aggravating circumstances: that Petitioner previously had been convicted of a felony involving the use or threat of violence; that he committed the murder in an especially cruel manner; and that he was an adult and the victim was less than fifteen years of age. (Special Verdict, 6/14/90.)

The court then considered and rejected the mitigating circumstances proffered by Petitioner. The court made the following finding with respect to Petitioner's assertion that drug use and/or withdrawal constituted a mitigating circumstance under A.R.S. § 13-703(G)(1):

Neither the defendant's ability to appreciate the wrongfulness of his

conduct or to conform his conduct to the requirements of law were substantially impaired. Even the defense experts found that he appreciated the wrongfulness of his conduct. Dr. Bendheim only found that it would be "more difficult" for the defendant to conform his conduct to the requirements of law, not substantial impairment. This difficulty was due more to his general personality and character than to drugs.

Even if the defendant had been experiencing a desperate craving for drugs that day, Jennifer Wilson did not stand between him and his drugs nor did she provide any means for him to obtain drugs. Her killing had nothing to do with drugs.

If the defendant's condition were truly such that he would go into withdrawals so severe that he acted strange when deprived of drugs, then this would have manifested after his imprisonment in the county jail on June 6. All the evidence is to the contrary: there were no symptoms of withdrawal.

This is not a mitigating circumstance.
.  .  .

The defendant was <u>not</u> intoxicated on June 6, 1988. Only two small bottles of vodka were missing from the carton. If the defendant consumed them, the amount of alcohol they contained would not suffice to make him intoxicated to the point where he would qualify for intoxication as a mitigating circumstance. The defendant denies he was intoxicated on anything else, claiming instead that he was experiencing withdrawals due to drug deprivation for several days. No one who had contact with him on June 6 reported that he acted intoxicated. They said he acted normal.

This is not a mitigating circumstance.

(*Id.*)

The court then determined that Petitioner "did not have a significantly difficult family life"; nor was "the fact that his family loves him and vice versa" a mitigating circumstance. (*Id.*) The court also found that Petitioner was not remorseful and that he presented a high risk of future criminal conduct. (*Id.*)

The court stated, in conclusion, that "[e]ven looking at the case in the light most favorable to the defendant, the court finds no mitigating circumstances. Therefore there is no way to cumulate or aggregate them." (*Id.*) Finally, the court explained that a proportionality review of the crime provided "no reason for mercy." (*Id.*)

On direct review, the Arizona Supreme Court held that the trial court erred in finding that the prior conviction constituted an aggravating factor. *Bible*, 175 Ariz. at 604, 858 P.2d at 1207. However, after reweighing the two remaining aggravating factors against the "de

minimis" mitigating evidence, the court affirmed the death sentence. *Id.* at 609, 858 P.2d 1212.

State court decision:

Petitioner presented his sentencing-stage IAC claim in his PCR petition, to which he attached the affidavits of Ms. Lawson and the mitigation specialist Mary Durand. In support of her opinion that the mitigation investigation on Petitioner's behalf was wholly inadequate, Ms. Durand outlined the features of a competent investigation. (PCR petition, Ex. D at 2-3.) According to Ms. Durand's affidavit, at a minimum the mitigation investigator must conduct "[e]xtended and extensive interviews with . . . anyone with knowledge relevant to mitigation" and "[o]btain and review all relevant records." (*Id.*) The investigator must analyze evidence of substance abuse in the client's history and that of his family; obtain psychological and/or psychiatric testing, as well as a neuropsychological examination "if there is evidence of birth trauma or headaches, asthma, high fever, vapor inhalation, drug use, head injury, or loss of oxygen in the development years"; and "[o]btain a multi-generational and trans-generational life history." (*Id.*) Ms. Durand attested that the mitigation investigation in this case did not meet these standards:

> No multi-generational or trans-generational history was done by the defense, no review of birth, school, mental health, medical or employment records was done by the defense, no review of law enforcement, court records or DOC. records, and no complete psychological or psychiatric examination was conducted. No mitigation specialist was ever consulted to determine needs.

(*Id.* at 3-4.) In her affidavit, the defense investigator, Ms. Lawson, concurred with this assessment, acknowledging that she failed to gather the records necessary for a complete mitigation investigation. (PCR petition, Ex. C at 2-3.)

As noted, the PCR petition also included a brief affidavit from a psychologist named Richard Lanyon. (*Id.*, Ex. E.) Dr. Lanyon stated that "a neuropsychological examination can document the effects of brain damage" and, echoing Ms. Durand, that "certain factors indicate that a neuropsychological examination is warranted," including "a difficult child birth, oxygen deprivation in childhood, one or more high fevers in childhood, headaches in

childhood, and inhalations of vapors in childhood." (*Id.*)

Without holding evidentiary hearing, the PCR court rejected Petitioner's claim that counsel's performance at sentencing constituted IAC:

> Numerous examples of what could or should have been done are recited. There is however no credible assertion, supported by affidavit, showing what mitigation evidence might have been discovered, or argument as to how the evidence might have resulted in a different sentence. An evidentiary hearing is not required where Petitioner stops short of revealing what relevant evidence would have been presented.

(ME 11/24/97.)

For the reasons discussed below, this decision was not an unreasonable application of *Strickland*.

Analysis:

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." 539 U.S. at 534. The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

The clearly-established federal law governing this claim includes the Supreme Court's decision in *Bell v. Cone*, 535 U.S. 685, which clarifies the standard this Court must apply in reviewing the PCR court's rejection of Petitioner's sentencing-stage IAC claim. After noting the deferential standards set forth in the AEDPA and required by its own precedent, the

Supreme Court explained that for a habeas petitioner's IAC claim to succeed:

> he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, he must show that [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-99 (citation omitted).

In evaluating Petitioner's claim of sentencing-stage IAC, this Court will follow *Strickland*'s instruction that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  466 U.S. at 697. The first step in assessing prejudice consists of a review of the evidence actually presented to the trial court so that it can be compared with the evidence Petitioner contends should have been presented.

Defense counsel placed before the court a detailed depiction of Petitioner's family background, which was relatively benign and which featured loving bonds between Petitioner and his family members; these bonds were dramatically exhibited when each of the family members pleaded with the court not to sentence Petitioner to death.  The testimony of family members and friends also served to humanize Petitioner by depicting him as a person whose positive qualities, including his strong relationship with his family, made his life worth sparing.  Although Petitioner argues that counsel should have obtained additional school or juvenile records, he has not suggested how counsel's presentation of Petitioner's background would have benefitted if unspecified information from these records had been offered.

Counsel also presented extensive evidence of Petitioner's history of drug abuse and the effects of that abuse on his mental state at the time of the crimes.  Through the testimony of Dr. Bendheim, counsel offered expert testimony unequivocally supporting counsel's argument that at the time of the crime Petitioner's ability to conform his conduct to the requirements of the law was diminished by the effects of drug withdrawal and that the crimes

1    would not have occurred absent Petitioner's abuse of drugs.[49]

2    Petitioner alleges that this presentation was insufficient.  He contends that counsel

3    performed ineffectively by failing to obtain and present additional mitigating information –

4    principally, evidence that Petitioner suffers from some kind of neurological impairment,

5    which was caused by his chronic drug abuse and/or various childhood illnesses.  (Dkts. 29

6    at 99, 98 at 30.)   Petitioner also contends that counsel should have supplemented Dr.

7    Bendheim's testimony about the effects of Petitioner's addiction on his ability to conform

8    his conduct with the requirements of the law.  (*Id.*)

9    The Court finds that Petitioner has failed to show that he was prejudiced by counsel's

10   performance.  Additional information regarding the effect of drug addiction or withdrawal

11   on Petitioner's ability to control his conduct at the time of the crime would have been

12   cumulative to Dr. Bendheim's unambiguous and uncontradicted conclusions. *See, e.g.*, *White*

13   *v. Mitchell*, 431 F.3d 517, 530 (6th Cir. 2005) (defendant was not prejudiced by counsel's

14   failure to retain additional experts to explain effect of intoxication on defendant at time of

15   murder, where evaluation that his alcohol use caused him to experience loss of critical

16   judgment would have been cumulative to evidence regarding the effect of alcohol presented

17   at both the guilt and penalty phases of the trial).  Moreover, the impact of such evidence on

18   the trial court's sentencing decision is highly speculative, given the testimony of witnesses

19   to Petitioner's condition on June 6, who reported that Petitioner did not display any physical

20   distress and appeared clear-headed and coherent, and the weight the trial court assigned to

21   that testimony in the court's special verdict.  Petitioner could not have been prejudiced by

22   counsel's failure to secure a second expert opinion which was based upon a factual scenario

23

24

25         [49]      The Court rejects Petitioner's complaints that Dr. Bendheim was a neutral
26   expert rather than an advocate and that the relevancy of his investigation was limited by his
     appointment as a Rule 26.5 expert. (Dkt. 29 at 95-96.)  In fact, as noted above, the trial court
27   directed both experts to evaluate Petitioner's central mitigation claim – that at the time of the
     crime his ability to conform his conduct to the requirements of the law was impaired.

28

1   – Petitioner's impairment – that the court rejected.[50]

2        The holding in *State v. Rossi*, 154 Ariz. 245, 741 P.2d 1223 (1987), does not assist

3   Petitioner.   Even assuming that Petitioner was suffering from severe symptoms of

4   withdrawal, his violent actions, unlike those of Rossi, who shot a man to death while stealing

5   his money, and in contrast to Petitioner's own conduct in stealing property from his relatives

6   to be pawned for drug money, were not an example of an addict doing "anything he can to

7   get the drug." *Id.* at 250, 741 P.2d at 1228.   If Petitioner's will was overborne by his need

8   to procure drugs, he would not have snatched a nine-year-old girl from her bicycle, taken her

9   to the top of a hill, removed her clothing, bound her hands with her own shoelaces,

10  bludgeoned her to death with a series of savage blows to the head and face, and concealed

11  her naked corpse beneath a pile of debris.   As the trial court noted in its special verdict,

12  Jennifer Wilson did not stand between Petitioner and his next fix, and her kidnapping and

13  murder did nothing to facilitate Petitioner's access to drugs.

14       The Court also concludes that Petitioner was not prejudiced by counsel's failure to

15  secure a neurological or neuropsychological examination of Petitioner.   As noted above,

16  counsel moved for the appointment of additional experts and neurological testing, albeit not

17  with enough diligence to satisfy the trial court.   The motion was based on recently-revealed

18  information from Ms. Bible that her son had been a sickly child.   (RT 6/11/90 at 11.)

19  However, as the PCR court observed in 1997 (ME 11/24/97), Petitioner has never attempted

20  to show, through affidavits or medical records, that any of the conditions he allegedly

21  experienced as a child – allergies, hyperactivity, headaches, or ringing ears – is a symptom

22  or cause of any condition that could be identified through neurological or neuropsychological

23  testing, let alone that he actually suffers from such a condition or that the condition could

24

25

26        [50]     The Arizona Supreme Court agreed with the trial court that Petitioner was not

27  intoxicated or suffering from withdrawal at the time of the crime. *Bible*, 175 Ariz. at 605-06, 858 P.2d at 1208-09.

28

1   serve as mitigating information.[51]  Therefore, whether or not counsel's belated discovery of

2   information that might have warranted further investigation into Petitioner's neurological

3   status constituted deficient performance, Petitioner cannot show prejudice.

4        Courts have recognized that mental health evidence is a "double-edged sword,"

5   particularly when counsel focuses his mitigation argument on the defendant's character or

6   amenability to rehabilitation.  *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir.1998) (counsel

7   exercised reasonable strategic judgment by "steer[ing] away from" evidence of organic brain

8   dysfunction, "calculating that it would not help portray [Petitioner] as normal and capable

9   of rehabilitation"); *Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (omitted

10  mitigation information of "serious brain damage" and lack of impulse control would have

11  displaced mitigation information portraying the petitioner as a "kind, compliant, and

12  responsible individual whose involvement in the murder was an aberration").  Counsel's

13  sentencing strategy was to present Petitioner as a person whose many good qualities were

14  compromised by his addiction to drugs, that those qualities resurfaced when Petitioner

15  became sober after his arrest, and that if Petitioner had not been a drug addict he would not

16  have committed the crimes.  This strategy was sound.  Whether or not it would have been

17  advanced if counsel had offered evidence of a neurological impairment predating Petitioner's

18  history of substance abuse is a matter of pure conjecture, since Petitioner has not suggested

19  the nature of the impairment or its potential function as evidence in mitigation of the murder

20  of Jennifer Wilson.[52]

21

22  [51]    From the testimony of Petitioner's family members and friends, it appears that
     Petitioner overcame his childhood illnesses and, during grade school, junior high, and high
23  school, participated in a variety of outdoor and extracurricular activities and excelled at a
     number of sports.  (*See, e.g.*, RT 6/12/90 at 47-52.)  Petitioner's mother also testified that he
24  was never injured while participating in sports; nor did he ever experience any disciplinary
     problems.  (*Id.* at 49.)  It is apparent that Petitioner's difficulties, as evidenced by his quitting
25  sports and dropping out of school, coincided with his increasing use of alcohol and drugs.
     (*See, e.g.*, RT 6/13/90 at 49-50.)

26  [52]    The Court recognizes that if Petitioner had presented the trial court with
27  evidence that he suffered from some type of neurological impairment, the court would have
     been obligated to consider such information, whether or not Petitioner could establish a

28
                                    - 102 -

1          Finally, in concluding that Petitioner has not shown prejudice from counsel's failure

2    to secure neurological or neuropsychological testing, the Court finds no reasonable

3    probability that the information revealed by such testing, assuming that it was beneficial to

4    Petitioner, would have persuaded the trial court not to sentence Petitioner to death.  Where

5    the aggravating factors are powerful, and counsel have presented other psychiatric evidence

6    in mitigation, courts have found that failure to present additional information concerning

7    organic brain damage does not constitute IAC.  *See Clark v. Mitchell*, 425 F.3d 270, 287 (6th

8    Cir. 2005) (state court reasonably applied *Strickland* in determining that defendant did not

9    suffer prejudice due to counsel's allegedly deficient performance in failing to introduce

10   additional mitigating evidence, including evidence of organic brain syndrome, drug addiction

11   and withdrawal, and troubled childhood, given that the evidence which was not offered by

12   counsel did not significantly expand upon information that was available to jury); *Knighton

13   v. Mullin*, 293 F.3d 1165, 1178-79 (10th Cir. 2002) (defendant was not prejudiced by

14   counsel's failure to obtain neuropsychological testing given that state's case against

15   defendant in both phases of trial was strong, the record supported three aggravating factors

16   found by jury, counsel presented a great deal of psychiatric evidence at sentencing, and

17   evidence that defendant suffered from "significant organic brain damage" would not

18   outweigh evidence supporting multiple aggravating factors); *Santellan v. Cockrell*, 271 F.3d

19   190, 198 (5th Cir. 2001) (counsel's failure to introduce potentially mitigating evidence that

20   defendant suffered from organic brain damage did not constitute IAC because, considering

21   the horrific nature of the offense, there was no substantial likelihood that the outcome of the

22   ────────────────

23   connection between the condition and his crimes. *Tennard v. Dretke*, 542 U.S. 274, 287
     (2004); *State v. Newell*, 212 Ariz. 389, 132 P.3d 833, 849 (2006) ("We do not require a nexus
24   between the mitigating factors and the crime to be established before we consider the
     mitigation evidence.").  However, the court would have been "free to assess how much
25   weight to assign to such evidence."  *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see
     Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given
26   relevant mitigating evidence").  Because Petitioner has not even suggested the form his
     impairment might take, this Court cannot make any assessment of its "quality and strength"
27   as mitigating evidence, *Newell*, 212 Ariz. at 389, 132 P.3d at 849, let alone speculate as to
     its effect on the sentencing court's calculations.

28

punishment phase would have been altered); *Cannon*, 259 F.3d at 1277-78; *cf. Sims v. Brown*, 415 F.3d 569, 581-86 (9th Cir. 2005) (failure to present equivocal evidence of organic brain damage did not constitute deficient performance where counsel presented other expert testimony and "heart-wrenching" mitigation evidence).

In *Eddmonds v. Peters*, 93 F.3d 1307 (7th Cir. 1996), the Seventh Circuit held that the habeas petitioner was not prejudiced by trial counsel's performance at sentencing. Eddmonds had been convicted of deviate sexual assault and murder and sentenced to death for smothering a nine-year-old boy to death while raping him. *Id.* at 1311-12. The killing was unintentional. *Id.* at 1322. At sentencing, counsel presented the testimony of a psychiatrist who recounted Eddmonds's history of mental illness, which included a diagnosis of schizophrenia. *Id.* Counsel also offered a brief closing argument asking the court for mercy. *Id.* at 1322. Eddmonds alleged that counsel's performance was ineffective because he did not seek additional psychological evaluations or present evidence of Eddmond's extreme mental and emotional disturbance at the time of the crime or information concerning his troubled upbringing and history of drug use. *Id.* at 1319-20.

In rejecting Eddmonds's claim of ineffective assistance, the Seventh Circuit reviewed the proffered mitigation evidence and found that "none of this would have helped had counsel expressly raised it at sentencing." *Id.* at 1321. The court then observed that:

> [W]e cannot forget the crime for which Eddmonds is being punished. The purpose of a sentencing hearing is to determine what punishment the defendant deserves for the crime he committed. A defendant's past is relevant and can be taken into account. But it is the crime of conviction that is the most important sentencing factor.

*Id.* at 1322.

After again describing the gruesome nature of Eddmonds's crime, the court concluded that "we are certain counsel's failure to throw a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in Eddmonds' favor." *Id.* Other courts have likewise recognized the limits of mitigating information when weighed against a particularly  heinous offense or powerful aggravating circumstances. *See, e.g.*,

1   *Woods v. McBride*, 430 F.3d 813, 825-26 (7th Cir. 2005); *Pizzuto v. Arave*, 280 F.3d 949,

2   968-69 (9th Cir. 2002); *Cannon*, 259 F.3d at 1277-78; *Gerlaugh v. Stewart*, 129 F.3d 1027,

3   1042-43 (9th Cir. 1997).  While the failure to present compelling mitigation evidence might

4   constitute IAC even where the aggravating evidence is substantial, *see, e.g.*, *Douglas v.*

5   *Woodford*, 316 F.3d 1079, 1091 (9th Cir. 2003), in the present case, where the crime was

6   particularly horrific, the mitigating evidence actually presented was far more compelling than

7   the evidence Petitioner contends was omitted.

8        Conclusion:

9        Defense counsel presented extensive testimony and argument in an attempt to

10  humanize Petitioner and convince the court that his crime was the product of drug addiction.

11  Petitioner alleges that counsel's performance was ineffective because he failed to offer

12  information that would have corroborated Dr. Bendheim's testimony or demonstrated

13  additional forms of impairment.  Such information, however, is cumulative in one instance

14  and completely theoretical in the other.  The PCR court recognized this when it reasonably

15  applied *Strickland* to reject Petitioner's sentencing-stage IAC claim.

16       Because Petitioner has failed to satisfy either *Strickland* or the AEDPA's deferential

17  standard, he is not entitled to relief on Claim 20.

18                              **EVIDENTIARY DEVELOPMENT**

19       Petitioner has not requested evidentiary development with respect to any specific

20  claim.  In his amended petition, he included only a general request for an evidentiary hearing.

21  (Dkt. 29 at 106.)  In his reply on the merits, filed August 10, 2005, Petitioner indicated that

22  a "motion for an evidentiary hearing, and for discovery in aid of the factual presentation at

23  the hearing, will be submitted separately by Petitioner."  (Dkt. 98 at 2; *see* Dkt. 101 at 2.)

24  Petitioner has not filed such a motion.  The Court has concluded, after reviewing the record,

25  that none of Petitioner's claims warrant evidentiary development because the allegations,

26  even if true, do not entitle Petitioner to habeas relief.  *See Landrigan*, 127 S. Ct. at 1940,

27  1944.

28

**CONCLUSION**

Petitioner committed an unspeakable crime.  He was tried, convicted, and sentenced to death.  On direct and collateral review he presented the state courts with claims that his federal constitutional rights were violated.  The state courts considered and rejected those claims.  The decisions of the state courts were neither contrary to nor an unreasonable application of clearly established federal law.  Therefore, Petitioner is not entitled to habeas relief.  The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 29) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on October 20, 1998, is **VACATED.**

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 25th day of July, 2007.


Paul G. Rosenblatt
United States District Judge

- 106 -